James Doyle, Appellee, v. James F. Burns, Appellant.

**Setting Aside Default:** CONDITIONS. Where a defendant volun-
1   tarily complies with all the conditions imposed precedent to
setting aside a default judgment against him, he cannot be
heard to complain of such conditions on an appeal from a
second judgment.

**Partnership:** ACTION BETWEEN TENANTS IN COMMON: FORUM.
2   Where the pleadings and proof disclosed an agreement of the
parties to locate and develop mining claims for their equal
benefit; each furnishing labor and supplies, but there was no
allegation or evidence that the agreement extended to work-
ing the mines on joint account, no partnership relation was
shown requiring the trial in equity rather than at law of an
action by one of the parties to recover the proceeds of his
share of the property so acquired and taken in the name of
the other; and even if a partnership were shown in the sub-
sequent working of the mine, neither a dissolution nor ac-
counting are sought requiring a trial in equity.

**Co-Tenants:** RECOVERY ONE AGAINST THE OTHER. One co-tenant
3   may maintain an action at law against another to recover a
specific part of personal property owned in common, or its
value in case it has been exchanged for other property, where
there has been a conversion of the same or where the property
is severable in character.

**Same.** Where one co-tenant has possession of common property
4   as bailee, an action at law will lie by another co-owner to
recover the same, and this would be true even though a trust
relation existed, where the interest of each was ascertainable
without an accounting and the trust a simple one.

**Contracts:** STATUTE OF FRAUDS. An agreement by which each of
5   the parties was to have a one-half interest in whatever mining
claims either might thereafter locate, or obtain an interest in,
each to furnish labor and supplies, was not within the statute
of frauds.

**Evidence:** DOCUMENTARY. Certain mining claims of which plain-
6   tiff and defendant were co-owners were exchanged by defend-
ant for shares of stock in a mining company, part of which
were placed in the name of a third person as trustee. In an

action by plaintiff against defendant to recover the value of one-half of such shares, the correspondence between an officer of the mining company and plaintiff, of which defendant and the trustee had knowledge, relating to a surrender of the shares and release of the trustee from liability is held admissible.

Evidence: WHEN PURPOSE OF A WRITING MAY BE SHOW BY PAROL. Where it was admitted that plaintiff had received from a trustee a portion of the shares of stock to which he was entitled, and was asked to release the trustee from all liability, as he claimed to deprive him of any further interest in the trust property, it was competent to show by parol the purpose of the release, the same being silent on that subject.

Evidence: PRACTICE. An objection that an answer is a conclusion should not be overruled because of the form of the question, where the answer is not responsive.

Evidence: OWNERSHIP OF SHARES OF STOCK. Evidence that plaintiff was engaged in an enterprise destructive of the property of a company in which he claimed to be a shareholder was admissible as bearing on the question of his interest in such company.

Evidence: DECLARATIONS AGAINST INTEREST: WHEN CONCLUSIVE. Sworn statements by plaintiff made in judicial proceedings and by affidavits that he, was not interested in certain properties are not conclusive against him in an action based on an alleged interest in such properties, in the absence of evidence of an estoppel.

Declarations Against Interest: INSTRUCTIONS. The fact that plaintiff made certain sworn statements that he had no interest in the property in question might have justified the jury in finding that he had no interest, and it was error to instruct that the same were insufficient to show that he had no interest.

Inconsistent Statements: INSTRUCTIONS. An instruction that the jury might disregard the evidence of a party or witness who ''has heretofore intentionally testified or sworn to statements inconsistent with his testimony,'' is erroneous, in failing to state that the statements must have been intentionally or knowingly false and on a material matter.

Conversion of Mining Stock: MEASURE OF DAMAGES. In an action for the value of shares of mining stock alleged to have been converted, the measure of damages is the highest value between the conversion and a reasonable time for replacing it,

if the purchase price has not been paid; or, if paid, the highest price between the conversion and the time of bringing the action, provided the action has not been unreasonably delayed, with interest from the time the value was fixed to the bringing of action, and dividends received to the time the value was fixed, with interest.

**Limitation of Actions:** LACHES AND ACQUIESCENCE. In equity 14 laches and acquiescence may bar recovery prior to the expiration of the ordinary limitation period, but at law a recovery may be had at any time prior thereto unless an estoppel is shown.

**Co-Tenants:** RECOVERY BY ONE AGAINST ANOTHER: DEFENSES: 15 FRAUD. Where plaintiff and defendant entered into an agreement to locate mining claims, each to have a half interest, and defendant sold the claims, receiving therefor stock in a mining company, one-half of which plaintiff seeks to recover, the fact that plaintiff made a false affidavit in perfecting title to the claims, though not in contravention of any statute, or that both parties were members of the corporation to which the claims were sold, and aided in making the sale, which is claimed to have been a fraud on the corporation, will not defeat plaintiff's action, as the agreement between the parties did not contemplate illegal practices and neither the company nor the government are complaining.

**Conversion.** There can be no conversion of property claimed by 16 plaintiff which he agreed might be turned over by defendant to a third person.

**Conversion:** INSTRUCTION. In an action for conversion, it was 17 error to instruct that plaintiff was entitled to the value of the property at the time of demand, where the conversion, if any was completed before the demand.

*Appeal from Pottawattamie District Court.*—Hon. W. R. Green, Judge.

Saturday, April 9, 1904.

Action at law to recover the value of certain mining stocks received and used or held by defendant, in which plaintiff claims an interest. Trial to a jury. Verdict and judgment for plaintiff, and defendant appeals.—*Reversed.*

*A. T. Gunnel, T. M. Patterson, C. S. Thomas, Carroll Wright, Ross & Ross, Walter I. Smith, Saunders & Stuart* and *Flickinger Bros.* for appellant.

*Chas. J. Hughes, Jr., Wright & Baldwin, Scott Ashton* and *A. W. Askwith* for appellee.

DEEMER, C. J.—Plaintiff contends that he and defendant in the year 1891 went to what is known as the "Cripple Creek Mining District," in the state of Colorado, for the purpose of prospecting for and locating mining claims, and that on or about February 2, 1892, they entered into an agreement whereby each should have an one-half interest in any and all mining claims which might thereafter be located by them, or either of them, or in which they, or either of them, might obtain an interest, éach to furnish such labor, supplies, or money as were necessary to perfect locations, etc.; that under said agreement there was located in El Paso county, Colo., the Tidal Wave lode mining claim, the certificate whereof and the title thereto being taken in the name of the defendant; that under said agreement defendant also procured and took in his own name two certain other lode mining claims, known as the "Devil's Own" and "Bobtail No. 2"; that plaintiff performed labor and furnished supplies for and upon each claim, entered into the possession thereof jointly with defendant, and assisted him in perfecting the title thereto. He further alleges that in March of the year 1894 defendant sold the Bobtail No. 2 to the Portland Mining Company, receiving therefor one hundred four thousand, six hundred and twenty-five shares of stock in the said Portland Mining Company, which belonged to the plaintiff; that in 1895 defendant sold the Devil's Own and the Tidal Wave claims to the said mining company, receiving therefor one hundred and twenty-seven thousand, six hundred and seventy-eight shares of stock in said company, which belonged to plaintiff, by reason of the aforementioned agreement; that defendant has received as dividends on the stock received from the Bobtail No. 2 claim the sum of $1.30 per share, and the sum of $1.20 per share on the stock received for the other claims. He also alleges that defendant has refused to deliver

to plaintiff the said stock and dividends belonging to him, and that the stock is worth $3 per share. His prayer is for judgment for the value of the stock, and for the amount of the dividends received thereon. Defendant, among other things, admitted that he held title to the claims hitherto mentioned in his own name, and admitted that he had conveyed the same to the Portland Mining Company, but denied that plaintiff had an interest either in the claims themselves or in the stock received therefor, and denied plaintiff's ownership of any of the stock, or dividends received thereon. Other issues were tendered by the answer, which will be referred to during the course of this opinion. These were the ones on which the case was submitted to the jury, resulting in a verdict and judgment for plaintiff in the sum of $446,922.73. The jury specially found that plaintiff had no interest in the Devil's Own claim, but that he did have the interest claimed by him in the Tidal Wave and Bobtail No. 2.

There are four hundred and forty-five assignments of error, and it is manifest that we cannot consider all of them. Indeed, we are not called upon to do so, for but a comparatively few of them are argued by counsel. Once for all, we may say that if the action is properly at law—a point we shall hereafter consider—the verdict has such support in the evidence that, were we acting as an appellate tribunal, we should not interfere therewith. We shall discuss such of the assignments of error as are argued, and seem of sufficient importance to demand separate consideration. Learned counsel tried the case in the court below, and we have had the advantage of able and exhaustive briefs, with such suggestions in oral argument as were deemed important to a full understanding of the question presented. We shall not take up the points in the order in which they are presented by counsel, but chronologically.

A judgment was at one time entered against the defendant by default for nearly double the amount of the verdict. This default judgment was set aside by the trial court on these conditions: That defendant should dismiss proceedings

brought by him in the courts of Colorado against the plaintiff-enjoining him (plaintiff) from proceeding with his case in this state; that he cause to be set aside all judgments and decrees obtained by him in the state of Colorado enjoining plaintiff from prosecuting this action, dismiss his proceedings for contempt brought in the Colorado courts, release any judgment obtained in these proceedings, and refrain from bringing any further proceedings against plaintiff in the courts of Colorado to enjoin these proceedings. It was also conditioned upon defendant's permitting this. cause to be prosecuted where brought, and provided that he should not remove it to any other court without plaintiff's consent. Thereafter defendant filed a showing of voluntary compliance with these conditions, but, before any final order setting aside the default was entered, the trial court made an amendatory order to the effect that defendant should pay to plaintiff the sum of $2,200 for the use of his attorneys in obtaining the default judgment. This amount was also paid voluntarily and without objection or protest, and the default was, on defendant's motion, set aside, and the cause again docketed for trial. These rulings are complained of. Much interesting history is involved in this feature of the case, which it is not deemed profitable to consider, for the reason that defendant voluntarily and without protest complied with each and every condition imposed, and secured the setting aside of the default judgment after compliance with the conditions on his own motion. Having so complied with all the conditions and provisions, he is not in position to complain of

1. SETTING aside default: conditions. them on this appeal. We are not to be understood as holding that in such a case conditions might not arise which would justify a court in waiving some of the conditions, because of matters transpiring after the order was made, but no such question is here presented, and we make no definite pronouncement upon the point. *Borgalthons v. Ins. Co.,* 36 Iowa, 250, and *M. & M. R. R. Co. v. Byington,* 14 Iowa, 572, are conclusive of the proposition presented.

II.   Before the case went to trial, and many times there-
after, the defendant insisted that this action was not triable
at law, and he moved to transfer it to the equity docket, and
2. PARTNERSHIP: in many other ways raised the point which he
action be-
tween ten-     now emphasizes in argument as a ground for
ants in com-
mon: forum.    reversal of the judgment.   The character and
nature of the action becomes a very material inquiry, in view
of the claims made by appellant's counsel.   They insist, first,
that plaintiff pleads a partnership existing between him and
the defendant, or, if this be not true, that defendant is sought
to be charged as a trustee holding property for plaintiff, for
which he should account, and that in either event the action
is solely cognizable in a court of chancery.   Inquiry must be
made as to the exact nature of the action, in order to prop-
erly solve the problem.   Mining partnerships are somewhat
peculiar in their nature, and the ordinary rules   regarding
such relations do not, it seems, apply.   Of course, there may
be a strict partnership in a mining venture—for   instance,
where it is formed for the purpose of working a mine by ex-
tracting the minerals therefrom—and in such a case there
must be an accounting in equity.   But parties may be ten-
ants in common of a mining property without being part-
ners.   It is alleged in the petition that the contract in this
case was for prospecting, locating, and developing mining
claims on the public domain in the Cripple Creek district
for the joint and equal benefit of the parties, and each was to
furnish labor, supplies, and money for this purpose.   If by
this it was meant to charge that the mine, when discovered
and developed, should be worked on joint account, doubtless
a partnership would have been created, at least   as to the
working of the mine.   But the petition does not allege such
an agreement, nor did plaintiff's evidence show it.   More-
over, the jury put this matter at rest by an answer to a spec-
ial interrogatory   submitted to it.   We agree with the Su-
preme Court of Montana, in *Boucher v. Mulverhill,* 1 Mont.,
310, in saying that such agreements should be construed ac-
cording to the intent of the parties, and, while they may speak

of each other as partners, this term, as is well known, does not in all cases mean that the parties are engaged in a joint enterprise, each agreeing to share in the profits and to bear a part of the losses of the particular business. In order to create a mining partnership, it seems to be necessary that there be an agreement to work the mine for the joint profit of the parties. Otherwise the owners of the property, acquired in such manner as is here charged, are tenants in common. *Duryea v. Burt,* 28 Cal. 569; *Hartney v. Gosling,* 10 Wyo. 346 (68 Pac. Rep. 1121); *Patrick v. Weston,* 22 Colo. Sup. 45 (43 Pac. Rep. 446); *Anaconda Copper Min. Co. v. Butte & B. Min. Co.,* 17 Mont. 519 (43 Pac. Rep. 492). Indeed, it seems to be held that the mere use of property so obtained for partnership purposes does not convert it into partnership assets, in the absence of an agreement to make it partnership property. *Hartney v. Gosling, supra;* Lindley on Mines (2d Ed.) section 802. So that, even if a partnership was charged as to the working of the mine, plaintiff is not asking for a dissolution thereof and an accounting, but for his share of the proceeds of certain property which was used by a partnership, but owned in co-tenancy with the defendant under an agreement for its joint acquisition. Defendant did not ask an accounting as to the partnership affairs, if they ever existed, and the partnership affairs, if there ever were any, are out of the case. *Settembre v. Putnam,* 30 Cal. 494, is an instructive case on this proposition, in that it involves many of the points relied upon by appellant's counsel. See, also, in support of our conclusions, *Manville v. Parks,* 7 Colo. 128 (2 Pac. Rep. 212). Appellant relies largely on *Murley v. Ennis,* 2 Colo. 300. But that case does not establish a doctrine which in any manner runs counter to the one we have announced.

Finding, then, as we do, that neither plaintiff's pleadings nor his proofs disclose a partnership, but that he and the defendant were co-owners or co-tenants of the mining claims, the next question is his right to recover in an action at law a specific part of the personal property, or its value,

received by the defendant in exchange for the mining claims.
Two propositions are relied upon here by the appellant:
First, that an action will not lie in favor of one co-tenant
against another for trover or conversion; and, second, that,
as plaintiff consented to the sale of the mining claims, and to
defendant's receiving the stock therefor, defendant became
plaintiff's trustee, and that no action will lie at law against
him for a recovery of the property or its value.

True it is that ordinarily an action of trover will not
lie as between tenants in common, for the reason that one is
as much entitled to the use and possession of the common
property as the other. But it is equally true
that if one co-tenant sells, destroys, or other-
wise disposes of the common property, the
other may maintain an action of trover against him. *Per-
minter v. Kelly,* 18 Ala. 716 (54 Am. Dec. 177); *Bray v.
Bray,* 30 Mich. 479; *Bell v. Layman,* 1 T. B. Mon. 40 (15
Am. Dec. 83). The authorities are inharmonious on the
question as to what disposition of such property will amount
to a conversion. A great majority of them seem to hold that
a sale by one co-tenant, in which the co-tenant represents
himself to be the sole owner, and professes to sell the
entire property, is a conversion, or what is the same
thing, an ouster. See cases cited in Freeman on Co-
Tenancy (2d Ed.) section 308; *Perminter v. Kelly,*
18 Ala., 716 (54 Am. Dec. 177); *Carr v. Dodge,*
40 N. H. 408. However, if the co-tenant consents to the sale,
as in the case at bar, there is no conversion, for that to which
one assents is not generally a wrong of which courts will take
cognizance. Manifestly a destruction of the subject-matter
of the tenancy amounts to a conversion. *Lowe v. Miller,* 3
Grat. 213 (46 Am. Dec. 188). And there may be such an
invasion of the rights of one co-tenant by another, or such ap-
propriation of the joint property by one of the members, al-
though the property itself be not destroyed, as amounts to a
conversion. *Delaney v. Root,* 99 Mass. 547 (97 Am. Dec.
52); *Agnew v. Johnson,* 17 Pa. 377 (55 Am. Dec. 565).

3. CO-TENANTS: recovery one from the 'other.

There is also another rule which we think is peculiarly applicable to such a case as this, and that is that where the subject-matter of the co-tenancy consists of chattels which are of a severable character, so that either of the co-owners may lawfully sever his share without the consent of the other, the taking of, and after demand retaining, exclusive possession, is a conversion of the property. *Lobdell v. Stowell,* 37 How. Prac. 93; *Lobdell v. Stowell,* 51 N. Y. 70; *Channon v. Lusk,* 2 Lans. 211; *Fiquet v. Allison,* 12 Mich. 330 (86 Am. Dec. 54); *Stall v. Wilbur,* 77 N. Y. 158; *Ripley v. Davis,* 15 Mich. 78 (90 Am. Dec. 262). In the instant case the shares of stock received for the mining claims are evidently severable in character, and either party could have appropriated his share without the consent of the other. Moreover, the jury was justified in finding that there was such a taking by the defendant, or refusal to surrender after demand, as amounted to a conversion, for which an action at law will lie.

The trust argument is more specious than sound. It fails to distinguish between a bailment and a trust. We are aware that some very good text-writers have made the same 4. SAME.    mistake. Story on Bailments, section 2; 2 Kent's Commentaries, 559. A bailment exists whenever the ownership and the possession of specific corporeal chattels are lawfully severed from each other. In a trust of personal property, the legal ownership passes to the trustee, and he has something more than bare possession. In cases of bailment the legal ownership is in the bailor, and the bailee simply has possession, which may or may not be for some specific purpose. But if we concede that defendant was a trustee, that does not settle the question of plaintiff's right to recover at law. Nowhere in the petition is there any claim that the defendant was to do aught with the stock received, except to turn over the one-half thereof to the plaintiff. The exact interest which plaintiff claimed, and the exact amount to which he was entitled, if entitled to anything, could be ascertained without an accounting. The trust was a simple

one, and there is no reason why an action at law in such a case will not lie. *Dyckman v. Valiente,* 42 N. Y. 549. This must be so, else there could never be a case of conversion between co-owners of property. If plaintiff's petition had disclosed an unsettled trust account between the parties, doubtless the motion to transfer should have been sustained, but it did not do so, nor was any such relief asked as would show the action to be of equitable cognizance. Defendant claims, however, that the proofs disclosed this state of facts, and that the action should have been dismissed for that reason. This proposition is fully answered in *Boyce v. Allen,* 105 Iowa, 249; *Matthews v. Drug Co.,* 110 Iowa, 231. Moreover, it seems to be held by courts of recognized authority that when a simple trustee denies that he is such, and asserts that the funds he holds are his own, a right of action at law accrues at once. *Davis v. Coburn,* 128 Mass. 377. In the instant case, as in *Smith v. Frost,* 70 N. Y. 65, which was an action at law, the defendant was a naked trustee, and when demand was made upon him nothing remained to be done, under plaintiff's theory, except to deliver the property. See, also, *Vincent v. Rogers,* 30 Ala. 471. The defendant does not plead in answer that he is entitled to any credits for money expended by him as trustee, and he introduced no equitable issues into his pleadings. This being true, we think there was no error in the respects claimed.

III. The next contention is that plaintiff cannot recover because his alleged agreement is within the statute of frauds both of Colorado and of this state. We shall not discuss this

5. CONTRACTS: statute of of frauds. further than to say that the authorities are against defendant's contention. *Hirbour v. Reeding,* 3 Mont. 15; *Murley v. Ennis, supra; Moritz v. Lavelle,* 77 Cal. 10 (18 Pac. Rep. 803, 11 Am. St. Rep. 229); *Pennybacker v. Leary,* 65 Iowa, 220; *Richards v. Grinnell,* 63 Iowa, 44. The two cases last cited seem to overrule *Thorn v. Thorn,* 11 Iowa, 146. But it is said that the agreement in this case had reference to existing claims, and that for this reason the cases above cited are distinguishable. We do not

so understand the facts. The claims were not perfected. *Strepey v. Stark,* 7 Colo. 614 (5 Pac. Rep. 111).

IV. The next points to which we shall refer have reference to the evidence, and first as to rulings on admission and rejection thereof. To refer to each and every one complained of would manifestly be impracticable. Such as are deemed important, and such only, will be considered.

6. EVIDENCE: documentary.

Much of the stock issued for the claims in which plaintiff asserts an interest was placed in the name of Kate Burns, as trustee. One Peck, who was an officer in the Portland Company, and also a relative of the defendant, wrote a letter to plaintiff in which he inclosed a written receipt to be signed by him (Doyle) to Kate Burns for the stock in her name. He (plaintiff) was also asked to bring over his stock, to see if he had received all to which he was entitled, that stood in the name of Kate Burns as trustee. This release or receipt read as follows:

"Know all men * * * that * * * heretofore there has been in the name of Kate Burns, 301,418 shares of Stock of the Portland Gold Mining Co. standing in her name upon the books of the company, which stock has been endorsed by the said Kate Burns to the undersigned; and whereas, the suit of John G. O'Haire, against the undersigned, has been settled and compromised, and the said stock is now about to be transferred to the undersigned, upon the books of said company.

"Now, therefore, I, James Doyle, do hereby forever release and discharge, the said Kate Burns from any and all liability of whatsoever kind or nature concerning said shares of stock, and undertake, promise and agree, to save and keep harmless the said Kate Burns, from any and all liability of whatsoever kind or nature, by reason of her having transferred the said stock to me, and caused the transfer thereof upon the books of the company. Done at Colorado Springs, Col., Jany. 5, 1897."

The letter to which we have referred, and this release, were prepared by the witness, defendant, and Kate Burns, and were, no doubt, binding upon the defendant. This letter was answered as follows:

"Victor, Colo., Jany. 22nd, 1897. Mr. Frank G. Peck, Colorado Springs, Colo.—Dear Sir: Your letter of yesterday at hand. The tunnel is not for sale at five times your offer. The stockholders of the Portland has receipts for all stock which I have received, and I see no occasion for signing the papers [Exhibit 30, release to Kate Burns, and Ex. 14, receipt to J. F. Burns, referred to in letter of January 20th] you request. Yours truly, James Doyle."

It is also claimed that plaintiff wrote to Peck the following letter:

"Victor, Colo., Jany. 21st, 1897. Frank G. Peck, Colorado Springs, Colo.—Dear Sir: Your letter with reference to receiving certificates I left with you at the Portland at hand. In reference to signing receipt for all Portland Stock that belongs to me in the name of Kate Burns, trustee, I am reluctant to inform you that I cannot sign it, as there were a large number of shares held by her in trust, that belonged to me, which is well known, at least to Mr. Burns. Very respectfully." (Unsigned.)

The receipt of this letter is denied by Peck.

All these matters were objected to, but the objections were overruled, and, as we think, properly.

It is admitted by all parties that Kate Burns, as trustee, held some stock to which plaintiff was entitled, and that he received this stock from the trustee before this correspondence was had. Plaintiff contends that the purpose of this release or receipt was to deprive him of any further interest in the stock held by her as trustee, or to embarrass him in the matter. To meet this, the defendant asked Peck for what purpose this release was executed and forwarded to Doyle. This was objected to as incompetent, immaterial, and irrelevant, and the objection was sustained. We think it should have

7. EVIDENCE: when the purpose of a writing may be shown by parol:

been overruled. There is nothing in the writing itself which conclusively indicates its purpose, and, in view of plaintiff's claim, we think it was quite important for the defendant to show the purpose for which it was sent.

Plaintiff, while a witness on his own behalf, and on cross-examination, was asked regarding the knowledge that the defendant and others had of his interest in the Tidal Wave and Devil's Own claims. The exact question was: "It was talked over then and there?" The witness answered: "I think there was mention made of it. They all knew it." Defendant objected to the witness testifying as to what these parties knew, but the objection was overruled on account of the form of the question. It should have been sustained, because it was evidently a conclusion of the witness. The question called for no such answer.

8. EVIDENCE: practice.

Defendant offered evidence to show that, after the sale of the claims to the Portland Company, plaintiff was the owner of and engaged in running a tunnel under the premises of that company, under a claim of superior title to, and adversely to the claims of, the Portland Company. This was claimed to be after the sale of the claims, and before plaintiff had made any demand on the defendant for any part of the Portland stock. The objection was that it was after the stock in controversy had been issued, and therefore immaterial. We think the evidence should have been admitted. If he, as co-owner of the mining claims, sold them to the company in which he became a large stockholder, it was for the jury to say whether or not he would be engaged in a venture to destroy the property, and in asserting a title in hostility to that company.

9. EVIDENCE: ownership of shares of stock.

There are no other rulings which seem to be erroneous, and, but for matters to which we shall hereafter refer, we should not feel like reversing the case on account thereof. Much that has already been said, and a great deal of what follows, is for the direction of the trial court on a retrial of

the case. We come now to some of the points with reference
to the evidence, which at times will involve a consideration
of the instructions.

V. Before this action was commenced, plaintiff swore
at least seven times that he had no interest in the mines here
in question—five times in affidavits, once in a verified plead-
ing filed by him, and once orally as a witness.
He gave an explanation therefor which was evi-
dently satisfactory to the jury. But defend-
ant contends that as some of these statements
were made in judicial proceedings, and once in a sworn plead-
ing, he is concluded thereby. That there are some authorities
which seem to so hold, there can be no doubt. But we do not
think they establish the correct rule, in the absence of evi-
dence from which an estoppel by record or *in pais* may be
found. The cases sustaining our conclusions are numerous.
See case cited in Jones on Evidence, section 298; *Louis-
ville & N. R. Co. v. Miller,* 19 Ky. Law Rep. 1665 (44 S.
W. Rep. 119); *Walker v. Irwin,* 94 Iowa, 448. There is no
claim of estoppel by record, and while defendant earnestly
argues that there is an estoppel *in pais,* we do not find that
defendant acted upon these sworn statements in any manner
to his prejudice. The elements of an estoppel *in pais* are so
well understood that we do not further refer to them. So
that these sworn statements, of no interest, were not conclu-
sive upon the plaintiff.

The trial court gave the following instruction with ref-
erence thereto: "(7) In this connection you should deter-
mine whether the plaintiff at any time failed to assert or to
make known his alleged interest in said claims,
under circumstances from which it would nat-
urally and in the course of common experience
be expected that a person having such an interest would make
the same known; and, if you find such to be the fact, while
it will not be in itself sufficient to show that the plaintiff had
no interest therein, it should be considered by you in deter-
mining whether or not the contract was in fact entered into

10. EVIDENCE:
declarations
against in-
terest: when
conclusive.

11. DECLARA-
TIONS against
interest: in-
structions.

as alleged by plaintiff, and given such weight in that connection as you deem it entitled." Defendant was relying for his defense in this action, among other things, not only on these sworn statements made by plaintiff, but also upon the fact that the plaintiff's entire course of conduct, from the time these mines were first located until just before the commencement of this suit, was such as to clearly negative the idea that he made any claims to any of the property in question, and to warrant and justify the jury in inferring or implying an admission by him of lack of title. The sworn statements made by plaintiff to which we have referred were declarations against interest, and properly admitted as such; and his failure to assert his claim, under the circumstances set forth in the instruction, was of a like nature. The instruction was, no doubt, good in so far as it refers to the doctrine of estoppel, but manifestly incorrect in so far as it refers to the effect to be given this evidence as bearing upon the direct question of want of interest in the property itself. It clearly directs the jury that such facts, even if shown, would not be sufficient, in and of themselves, to show that plaintiff in fact had no interest therein. Is this the law? Surely not. A jury might find from such circumstances alone that a plaintiff so conducting himself in fact had no interest in the property. In the absence of an estoppel, it was not bound to do so, but it was error for the court to say that it could not do so. Doubtless the mistake was due to counsel's determined insistence that plaintiff was estopped by conduct from claiming any interest in the property That, as we have seen, is not true. But it is also clear that, while there may have been no estoppel by conduct, the jury, from such evidence as we have referred to, alone, might have found that plaintiff had no such interest in the claims as he now asserts. This may have been vital to the case, and, on account of the manner in which it was tried, a jury might well have said, after reading this instruction, "True, all these matters on which the defendant relies are shown, but, under the instructions of the court, they are not

alone sufficient to justify us in returning a verdict for defendant, although, but for this instruction, we should have found that plaintiff had no interest." Counsel for appellee, in an able and ingenious argument, contend that the instruction, as a whole—particularly when construed with the other instructions—is not erroneous. They refer particularly to the last clause of this instruction, and say that the jury was justified thereunder in giving the matters full weight in determining whether or not there was such a contract as is claimed, and that the former part of the instruction simply had reference to the claim of estoppel. This may have been the thought of the trial court, but would a jury so understand it? If plaintiff made the contract which he claims, he had an interest in the mine. If he did not make it, he had no interest. Hence, if we say that, under the latter part of the instruction, the jury might have found, from the matters referred to, that there was no contract, and therefore no interest, we have a conflict in the rules announced, and no means for determining which one the jury followed. It is not possible, we think, to divorce the word "contract" from "interest," and, if it were possible, the two are so intimately connected in the instruction that a jury would be unable to consider them in an intelligible way.

In the twenty-fourth instruction the court said: "Where the evidence shows that a party or witness has heretofore intentionally testified or sworn to statements inconsistent with his testimony in this case, you are at liberty to disregard his evidence, except where corroborated by other credible evidence; and the same rule applies to a party or witness, if any there be, who you find to have willfully testified falsely in this case to any material matter. But you are the judges of whether the credibility of any party or witness who has testified here has thus been destroyed." The first part of this instruction is erroneous, in that it neglects to state that the statements must have been intentionally or knowingly false, and that they should have been as to a material matter. *McPherrin v. Jones,* 5 N. D. 26 (65 N. W.

Rep., 685); *Pope v. Dodson,* 58 Ill., 365; *Schmidt v. St. Louis R. R.,* 149 Mo. Sup. 269 (50 S. W. Rep., 921, 73 Am. St. Rep. 380); *Matthews v. Granger,* 196 Ill., 164 (63 N. E. Rep., 658); *Pease v. Smith,* 61 N. Y., 477; *Barney v. Dudley,* 40 Kan., 247 (19 Pac. Rep., 550); *Moresi v. Swift,* 15 Nev., 215; *Schmitt v. R. R.,* 89 Wis., 195 (61 N. W. Rep., 834); *Singer Co. v. Cramer,* 109 Fed., 652 (48 C. C. A., 588); *Callanan v. Shaw,* 24 Iowa, 446; *State v. Buechler Co.,* 103 Mo. Sup., 203 (15 S. W. Rep., 331). On account of an instruction asked by the defendant, we should not be disposed to reverse because of the error in this instruction, if that were the sole point in the case. What we have said is for the guidance of the trial court in the future.

VI. Many other instructions are complained of. We shall not set them all out, as to do so would unduly extend an opinion already too long.

The two points most relied upon here are that, under the instructions, plaintiff was entitled to recover the value of shares of stock which were never received by him, or, if received, were disposed of with plaintiff's consent, in such a manner as to dispose of the notion that they were converted, and that, in any event, plaintiff was permitted to recover more than he was entitled to under the allegations of his petition. The second point relates to the correctness of the instructions with reference to the measure of damages.

The first point relates largely to a question of mathematics, which we do not feel called upon to determine at this time. Of course, defendant cannot, in this action, be held liable for stock he did not receive, nor can plaintiff recover for stock which was disposed of by defendant with his knowledge and consent. Under a proper showing, he might, perhaps, recover his proportion of the proceeds received by defendant for the stock so disposed of, on the theory of money had and received for plaintiff's use and benefit, as in assumpsit, but there would be no conversion of the stock. This much is all that need be said now regarding the first point. We shall refer to the matter again in one of its phases, before

closing the opinion. From our examination of the record, we are inclined to think these rules which we have just referred to were not as sharply drawn as they should have been, and that there were, perhaps, some erroneous assumptions in this respect in the charge as given.

VII. As to the measure of damages the court instructed as follows: "(24) If the defendant did convert to his own use any stock belonging to plaintiff, such conversion was willful, and for any such stock as you find the defendant has now in his possession or under his control the plaintiff would be entitled to recover the value thereof at the present time, which, as shown by the evidence, is three dollars per share, together with the dividends thereon which have accrued since the defendant received the same, according to the table of dividends offered in evidence. For any stock belonging to plaintiff and converted to the defendant's use, and not in the possession or under the control of the latter, according to the evidence, the measure of his recovery will be the value thereof at the time plaintiff made demand for the same, together with the dividends accrued thereon from the time the stock was issued by the Portland Company in payment for the claim or claims up to the time when the demand was made, and together with six per cent. interest on the total of the value of the stock and dividends from the date of the demand to the present time." These are challenged, and the point thus presented calls our attention to a subject upon which there is great doubt and confusion in the authorities. See Cook on Stock & Stockholders (3d Ed.) Section 581 *et seq.,* and cases cited. With reference to the conversion of property in general, we have heretofore adhered to the rule announced by the great weight of authority, that the measure of damages is the value of the property at the time of the conversion with interest. *Gensburg v. Marshall Field & Co.,* 104 Iowa, 599, and cases cited. This is also the rule in Colorado, where this cause of action arose. *Continental Co. v. Bliley,* 23 Colo., 160 (46 Pac. Rep., 633). As applied to corporate stock,

13. CONVERSION of mining stock: measure of damages.

there has been, as we have said, much confusion in the cases, and it is useless to attempt to review or reconcile them  In *Loetscher v. Dillon,* 119 Iowa, 202, the question was presented, and we there quoted with approval the general rule stated in 2 Sedgwick on Damages, Section 507 *et seq.,* and, without committing ourselves unqualifiedly on the subject, accepted the statement there made as being a correct exposition of the rule.     It is as follows:     "The weight of authority supports the proposition that where the stock is marketable, the owner, bringing an action for its value, may recover the highest value which it attains between the time of conversion and a reasonable time for replacing it, if the purchase price has not been paid, or, if the purchase price has been paid, then the highest value between the conversion and the time of the bringing of the action, provided the bringing of the action is not unreasonably delayed."

In addition to this, there may also be recovery of interest and dividends.   That is to say, plaintiff is entitled to the dividends received by the defendant upon the stock from the time he received it down to the time the value of the stock is fixed by the jury, with interest thereon at the legal rate from the time of the receipt of the dividends down to the time of the trial.   This for the reason that, until the value of the stock is fixed for the purpose of determining the plaintiff's damage, he was entitled to the dividends earned from time to time, for the property was his, under all circumstances, until that time.   After the value is fixed, and the amount awarded is paid, the title to the stock passes to the defendant, by relation back to the time when the value is determined, and from that time on he is, to all intents and purposes, the owner of the stock.   As to interest on the value of the stock itself, plaintiff is entitled thereto, at the legal rate, from the time the value of the stock is fixed down to the time the verdict is returned, for the reason that he is at that time entitled to the money value of the stock, rather than to the stock itself, in such an action as this, and the debt being, by operation of

law, created at that time, plaintiff should have interest there-
on, as before stated. This is the rule announced in *Citizens'
R. R. v. Robbins,* 144 Ind. Sup., 671 (42 N. E. Rep. 916),
and we think it is a just and reasonable one. With the gen-
eral rule adopted in the *Loetscher Case, supra,* to which
should be added interest and dividends, as stated, we are con-
tent. It does not allow either party to speculate at the ex-
pense of the other, but is entirely just, in that it is fully com-
pensatory. The rule announced by the trial court, to wit,
value at the time of trial, or highest market value between
conversion and date of trial, punishes a defendant who re-
tains converted property after suit is brought, if it rises in
value, and, if the inflexible rule announced by that court is to
prevail, punishes the plaintiff if the stock decreases in value.
Moreover, such a rule pre-supposes that a plaintiff suing for
conversion would have held his stock and sold it at the time it
reached its highest market price, which, as we all know, is a
very violent presumption. Any rule which is made to depend
upon the condition of court dockets, the indisposition of par-
ties or counsel, or even of witnesses, is too uncertain to re-
ceive our approval. Perhaps the strongest cases on this ques-
tion are *Barnes v. Brown,* 130 N. Y., 372 (29 N. E. Rep.
760) ;*Galigher v. Jones,* 129 U. S. 193 (9 Sup. Ct. Rep. 335,
32 L. Ed. 658) ;*Pickert v. Rugg,* 1 N. D., 230 (46 N. W.
Rep. 446) *Chadwick v. Buller,* 28 Mich., 349—which sup-
port the rules we have announced. See, also, the following
text-writers: 2 Thompson on Corporation, section 2479; 2
Clark & Marshall on Corporation, section 1168; Cook on
Stock & Stockholders, section 581; Joyce on Damages, sec-
tions 1176, 1179; Jones on Pledges, etc. (2d Ed.) section
756b; and Sedgwick on Damages, heretofore cited in this
opinion. Even in an action for breach of contract of sale,
brought by a buyer who has paid the purchase price, the rule
is that he may recover the highest market price between the
day fixed for delivery and the time suit is brought, provided
the plaintiff does not unreasonably delay the institution of
his suit. *Cannon v. Folsom,* 2 Iowa, 101; *Stapleton v. King,*

40 Iowa, 278; *Gilman v. Andrews,* 66 Iowa, 116; *Manville v. Weston Union Telegraph Company,* 37 Iowa, 219. There is no sound reason for allowing any greater recovery in actions for the conversion of the property. See, also, as bearing on this question, *Gravel v. Clough,* 81 Iowa, 272; *Brown v. Allen,* 35 Iowa, 306. From what has been said, it is apparent that we do not agree with the learned trial judge on the question of the measure of damages.

VIII. Other questions likely to arise on a retrial, we shall now proceed to discuss:.

Defendant's plea of estoppel has already been considered, and we need not give it any further consideration.

He also pleaded laches, and acquiescence, abandonment, and such conduct on the part of plaintiff with reference to the location of the claims, and the sale thereof to the corporation, as bars him of recovery. As to laches and acquiescence, which are a species of estoppel, the trial court failed to give any instruction on these issues, and of this complaint is made. It is contended that plaintiff was entitled, under his claims, to stock issued for Bobtail No. 2 on March 30, 1894, and to the remainder on July 20, 1895. The demand for the stock was made on February 2, 1898, and this action was commenced on February 7, 1898. Under plaintiff's theory of the case, and his contention as to the arrangement he had with defendant about the stock, it is clear there was no room for application of the doctrines contended for. From defendant's standpoint, there was, as it appears to us, no error in refusing to submit these special defenses. This is a law action, and, of course, laches and acquiescence may be material in such a forum as well as in a court of chancery, although the rules are somewhat different in the two jurisdictions. In equity, laches and acquiescence may bar plaintiff of recovery, although the delay and acquiescence have not been for such a length of time as that the action would be barred by the ordinary statute of limitations. Where the action is at law, mere delay or acquiescence will not bar the action, unless prolong-

*(margin note: 14. Limitation of actions: laches and acquiesence.)*

cd for the statutory period, save where there is present the elements of an estoppel. These being present, laches and acquiescence may constitute a bar to a law action. In this case there were no elements of estoppel present, and the trial court did not err in refusing to submit that question to the jury. These doctrines are fundamental, and we need only cite in their support 2 Pomeroy's Equity, section 817; 1 Pomeroy, Equity, section 618; *Long v. Valleau,* 87 Iowa, 675; *Wehrman v. Conklin,* 155 U. S. 327 (15 Sup. Ct. Rep. 129, 39 L. Ed. 167). Moreover, defendant did not plead laches and acquiescence as an estoppel. They were relied upon purely as an equitable defense, in and of themselves, and, as we have seen, they do not constitute a bar. As to plaintiff's alleged abandonment of his claims, the trial court instructed the jury with reference thereto. *Animus revertandi* is the test in such cases. *Stone v. Geyser Co.,* 52 Cal., 315. And this was presented to the jury.

Before considering the next propositions relied upon by the defendant, it is necessary to set out the facts upon which they are based: It seems that Burns, Doyle, Harnan, Peck, and another were members of the board of directors of the Portland Company. The four named, in session as a board, voted to purchase a large number of mining claims, including these in controversy, for the sum of $1,025,000. A majority of the directors, according to plaintiff's claim, were interested in these claims. It seems that Peck made the motion for the purchase, and that Doyle seconded it. This arrangement was finally consummated, and on the same day Peck and Doyle each received twenty-five thousand shares of stock issued as a result of the transaction, without paying anything therefor. Doyle says that these came from one Stratton, who, it seems, was interested in some of the claims purchased by the Portland Company, while Burns claims that he gave these shares to Doyle and Peck. Shortly after this, plaintiff claimed that the property purchased was not worth what was paid for it, and he served notice on the board

*15. CO-TENENTS: recovery by one against another: defenses: fraud.*

of directors to bring suit against the directors for money and treasury stock issued in excess of the value of the property received. He says, however, that this did not refer to properties in which he claimed an interest. But it is true that he was active in securing the passage of a motion to purchase property in which he was interested; that he voted therefor, and received from some one twenty-five thousand shares of stock as a present. It further appears that, in making an application for a patent of the Tidal Wave claim to the Department of the Interior, Burns filed an affidavit required by a rule of the department as to certain matters essential to be shown, and also two corroborative affidavits, one of which was signed and sworn to by plaintiff. The rules of the department required that these affidavits should be from disinterested and credible witnesses. In his affidavit, Doyle testified that he had no interest in the Tidal Wave claim. He now asserts that he was at all times interested. These facts are relied upon to defeat the plaintiff. It must, of course, be conceded that in the one case the transaction was a fraud upon the Portland Mining Company; and in the other, that the government might, perhaps, have set aside the patent issued upon the false affidavit. But neither the corporation nor the government is complaining, and it seems that the corporation, with full knowledge of all the facts, has ratified the transaction, so far as it is concerned. But it is claimed that the plaintiff cannot avail himself of the fruits of his own fraud and perjury. In neither case was the conduct of the plaintiff illegal, in the sense that it was contrary to the provisions of an express statute, unless, perhaps, it may be said that the statement in the corroborative affidavit constituted perjury. The conduct of the plaintiff in voting for the purchase of the claims, and in receiving the bonus of twenty-five thousand shares, may have been a fraud upon the corporation or its stockholders, but the corporation is neither the complainant nor the defendant in the case. Moreover, if plaintiff and defendant had entered into a conspiracy to defraud the corporation, and as a result thereof, secured shares of stock to which

they were not entitled, it may be that no action would lie between them to settle and adjust their respective rights or claims. The fact, however, . that the corporation with full knowledge of the facts, retains the claims, and does not seek to disaffirm the transaction, has a very important bearing in this connection, for primarily it is the only one who may take advantage of the alleged fraud. When one of several joint parties to a contract has received the profits thereof, he cannot deny liability to his associates on the ground that the contract was voidable as to the other contracting party, in the absence of some question of public policy. There is a manifest distinction between the enforcement of an illegal contract and the assertion of title to money or property which has arisen out of it. See, as sustaining our conclusions, *Brooks v. Martin,* 2 Wall., 70 (17 L. Ed. 732); *Buell v. Buckingham,* 16 Iowa, 284; *Stetson v. Northern Investment Co.,* 104 Iowa, 393. We shall not elaborate this proposition, for enough has been stated to indicate our views thereon.

As to the affidavit filed to secure the patent for the Tidal Wave claim, the principles of law are much the same as those just outlined. Defendant relies chiefly on *Ainsworth v. Miller,* 20 Kan., 220. But in that case there was a contract between Miller and Ainsworth, whereby Miller was to enter land in violation of section 13 of what was known as the homestead act of 1841 (Act Sept. 4, 1841, chapter 16, 5 Statute 456), swear that Ainsworth had no interest in it, and then convey the land to Ainsworth. Ainsworth paid part of the money which was used in making the entry, and Miller made the affidavit required by statute, which was false. A controversy arose between Miller and Ainsworth over some of the property, and the court held that, since Miller had obtained title pursuant to a false affidavit, and in violation of an express statute, he could not recover. In the instant case there is no statute requiring such an affidavit as Doyle made, and there is neither allegation nor proof that plaintiff and defendant entered into any agreement to procure title or patents to mining claims through fraud or deceit. Even the

false affidavit would not defeat Burns' claim to the mine. It might, perhaps, have been grounds for setting aside the patent, in a suit brought by the government, but this would not have defeated the original claim. Unless the parties were in *pari delicto*, or entered into a corrupt agreement to secure title by fraudulent means, the mere fact that plaintiff made a false affidavit as to noninterest would not defeat him of his claim to a part of the proceeds resulting from a sale of the property, in which he had a joint interest with the defendant. Such affidavit should, of course, be considered in determining whether or not he had any interest in the claim, but that he made it is not in itself sufficient to defeat his claim, if he in fact had such interest. Moreover, these requirements of the department were solely for its own benefit and protection. No one other than the government had any interest therein. As to every one but the government itself, the patent secured by this false affidavit was good. The Portland Company could not have defended an action brought against it for the purchase price of the claim by showing this false affidavit. See, as sustaining our conclusions on this point, *Coal Company v. U. S.*, 123 U. S., 307 (8 Sup. Ct. Rep. 131, 31 L. Ed. 182); *Davis v. Wiebold*, 139 U. S. 507 (11 Sup. Ct. Rep. 628, 35 L. Ed. 238).

The strong point here against appellant's contention is that no one contends that the agreement between these parties contemplated the making of false affidavits or the pursuit of any other illegal means for the purpose of obtaining either title to these claims or to the proceeds thereof. Doubtless, if such an agreement were shown, the court would be justified in dismissing plaintiff's claims, and in refusing to recognize them, even if there were no pleading interposed by the defendant raising this issue. But no such agreement is shown.

The maxim, *"Ex dolo,"* etc., on which appellant relies, does not apply where the right of a third party is to be affected. Thus, although A. obtains property from B. by fraud, he may nevertheless recover the purchase price from C., to whom he has sold the goods. This is pointed out, and the

general doctrines we have enunciated clearly expressed, in Broom's Legal Maxims (6th Am. Ed.) *711 *et seq.* The maxim, *"In pari delicto,"* does not apply, for reasons stated by the same learned author at star pages 693, 694 and 699.

IX. The only other point we care to consider relates to the recovery by plaintiff for certain stock received for the claims in which plaintiff asserts an interest, that were by the defendant turned over to one Peck, which defendant claimed belonged to him (Peck), because of his (Peck's) one-fourth interest in the mine known as "Bobtail No. 2." It does not appear from the evidence that plaintiff ever demanded these shares of stock from the defendant. The instructions given by the court were to the effect that, if plaintiff was entitled to recover, he should be compensated for the value of one-half the shares of stock turned over to Peck, for the reason that there was no evidence to show that plaintiff ever consented to the turning over of these shares. There was manifest error in these instructions. Evidence was introduced tending to show that plaintiff consented to defendant's turning these shares over to Peck as and for a one-fourth interest in the mine. Moreover, there was evidence that the defendant never received these shares of stock or their proceeds, but that the same were issued directly to Peck by the Portland Company. A reading of the record convinces us that plaintiff himself consented to the turning over of these shares to Peck in payment of his (Peck's) interest. This being true, there could 16. CONVERSION. be no conversion of that stock by the defendant. The number of shares received by Peck on this score was 69,-750. In any event, the question of the conversion of this stock should have been submitted to the jury under proper instructions. The court not only erred in the respects pointed out, but also erred in stating to the jury that plaintiff was entitled to one-half of this stock, unless defendant showed that he expended the proceeds thereof upon the mine called "Bobtail No. 2." Of course, that cannot be the test of conversion. But there is still another error here. The court instructed, as we understand it, that plaintiff was entitled to the value

of one-half of the stock at the time he made demand there-
for from defendant. There was no demand
therefor, unless the filing of an amended petition
during the course of the trial amounted to a demand. But
this is not the true rule of law, as applied to the facts shown.
Demand and refusal to surrender do not in all cases, if, in-
deed, they do in any, constitute a conversion. They are sim-
ply evidences thereof. There may be a conversion without
a demand, and, as applied to the Peck stock, there was a con-
version, if conversion at all, when defendant turned it over
to Peck; and the value should have been fixed with reference
to that time, rather than from the time of demand. This er-
ror is practically conceded, as we understand it. But if we
are wrong in this, it is so apparent that no satisfactory an-
swer has been made to appellant's contention on this point.
Hitherto in this opinion we have referred in a general way
to this point.

X. We have now done with the case, and need only say
in conclusion that we find no such misconduct of counsel upon
the trial as would have justified a reversal. Time and again
we have gone over this long record, and the very extensive
and able briefs of counsel, and have given the case the care
and attention its magnitude demands. The verdict is un-
doubtedly the largest one ever returned in the state. The case
has been tried from the beginning with commendable zeal
and very unusual ability. From the original statement made
at the beginning of the opinion, it might appear to be a com-
paratively simple action for conversion. But he who has
cared to follow the mazes of this opinion has discov-
ered many intricate and troublesome problems, some of which
are doubtful because of the wealth of authority, and some be-
cause of the dearth thereof, but all or nearly all interesting
and sufficiently perplexing to trouble the mind of any law-
yer or judge.

Having now considered every point of importance, or
that is likely to arise upon a retrial, we reach the conclusion
that the judgment should be, and it is, REVERSED.