JAMES DOYLE, Appellee, v. JAMES F. BURNS, Appellant.

**Instruction:** IMPROPER REFERENCE TO EVIDENCE: WAIVER: NEW TRIAL.

1 The court in its instructions should not give undue prominence to a single evidentiary fact in such manner as to mislead the jury into giving decisive effect to a matter not in itself controlling; but if the court is misled into giving such an instruction by counsel urging the error in a motion for a new trial there may be a waiver of the error, still if the court is of the opinion that counsel was not wholly to blame for the erroneous instruction it may disregard the waiver and grant a new trial.

**Misconduct of jurors.** The statement of a juror during the course
2 of the trial to other members of the panel that the parties, who were nonresidents, had no right to bring their action in this State where they paid no taxes, when standing alone is not sufficient evidence of misconduct to authorize a new trial, but when taken in connection with other improper influences employed to affect the result the court may be justified in holding the expression indicative of prejudice.

**New trial:** MISCONDUCT OF PARTIES IN INFLUENCING THE JURY. It is

not permissible for a litigant through a hired agent to excite public sentiment, and to so impregnate the moral and social atmosphere in which the jury moves with the spirit of partisan prejudice against his opponent that the verdict shall be affected and determined thereby, even though no direct attempt is made to corrupt the conscience of the individual jurors; and the court should rebuke such conduct by granting a new trial, although the other party adopted similar tactics.

*Appeal from Pottawattamie District Court.*— HON. A. B. THORNELL, Judge.

MONDAY, DECEMBER 16, 1907.

REHEARING DENIED, TUESDAY, MAY 12, 1908.

THE opinion states the case.— *Affirmed.*

*A. T. Gunnell, T. M. Patterson, C. S. Thomas, Walter I. Smith, D. L. Ross, and Saunders & Stuart,* for appellant.

*Wright & Baldwin, C. J. Hughes, Jr., and A. W. Askwith,* for appellee.

WEAVER, C. J.— It is the claim of the plaintiff that in the year 1891 he and the defendant entered into a joint enterprise for the location of mining claims in the State of Colorado, and agreed between themselves that the claims which they or either of them should thereafter locate, whether in their individual or joint names, should be owned by them in equal shares; that while acting under said agreement they did locate several valuable claims, among them three known as " Devil's Own," " Tidal Wave," and " Bobtail Number Two," which were entered in the individual name of the defendant, but were in fact owned by the said parties in common; that defendant thereafter sold said claims to the Portland Mining Company, receiving therefor a large number of shares of the capital stock of said company of

which the plaintiff became the owner and was entitled to receive two hundred and thirty-two thousand, three hundred and three shares, but defendant, though often requested to do so, has refused to surrender or account for said shares, but has continued to collect large dividends thereon, and has converted both the shares and the dividends to his own use. Judgment is asked for the value of the shares so converted and for the dividends so collected. The parties are both residents of Colorado. This action was begun February 7, 1898, in the district court of Pottawattamie county in this State, and personal service on defendant was secured in that county. Defendant failed to appear to this action, and judgment by default was entered against him for something over $700,-000. An application to set aside said judgment and default and to permit defendant to take issue on the petition was sustained, on condition, however, that defendant consent to try the case in the district court of Pottawattamie county, and waive his right and claim, if any he had, to remove the same to another forum, and that any attempt to remove the same should have the effect to reinstate the judgment entered against him. This consent was given, and thereupon defendant filed an answer to the plaintiff's petition. Trial being had to the jury on the issues thus joined, there was a verdict and judgment for plaintiff. On appeal to this court the cause was remanded for a new trial because of certain errors appearing in the record. *Doyle v. Burns,* 123 Iowa, 488. On a retrial in the district court there was a verdict for defendant. Plaintiff's motion to set aside this verdict and for a new trial having been sustained, the defendant has again appealed. The motion for new trial was grounded upon alleged errors of the district court and charges of misconduct on part of the jury and of the defendant set forth in something more than one hundred specifications. The trial court in a written opinion held that three of the specifications named afforded sufficient ground for sustaining the motion, and granted a new trial.

I.    It is the claim of the plaintiff that he and defendant jointly located a certain claim called the "Portland" early in the year 1892; that on or about February 2, 1892,

1. INSTRUCTIONS: improper reference to evidence: waiver: new trial.

they entered into an agreement by which they were to unite their efforts and interests in the location of other claims, all of which were to be owned by them in common, and that in pursuance of such agreement they did locate or secure the other named claims in which they had equal interests. On the other hand, it is the claim of the defendant that plaintiff alone located and became the sole owner of the Portland, while he on his part located and became the sole owner of another claim known as the "Professor Grubbs," and that thereafter, on March 14, 1892, the parties entered into an agreement by which plaintiff gave defendant a half interest in the Portland in exchange for a like interest in the Professor Grubbs.    These two mines defendant asserts represent the entire extent of their joint enterprise or ownership, and that plaintiff never had or owned any interest in the Devil's Own, the Tidal Wave, or Bobtail Number Two, and has no right to demand or receive any part of the money or stock acquired by the defendant in the sale of said claims.    Bearing upon this feature of the controversy, the trial court gave the jury an instruction as follows:

Fourteenth.    It is claimed by the defendant that the plaintiff located the Portland claim about January 22, 1892, in the name of James Doyle & Company, and that the defendant had no interest in the location thereof, and that about March 2, 1892, the defendant located a claim called the Professor Grubbs, and that about March 14, 1892, he, the defendant, traded a one-half interest in the Professor Grubbs claim to the plaintiff for a one-half interest in the Portland claim, and that, in pursuance of said agreement, the names of both the plaintiff and the defendant were inserted in the location certificates of both of said claims, and that, before said agreement of exchange of one-half of the Professor

Grubbs claim for one-half of the Portland claim, he, the defendant, had no interest in the Portland, and the plaintiff had no interest in the Professor Grubbs. Now, if the evidence shows that the defendant had no interest in the Portland prior to March, 1892, and that the plaintiff then agreed to or did trade or exchange with the defendant, giving a one-half interest in the Portland for a one-half interest in the Professor Grubbs claim, this would be so inconsistent with the plaintiff's claim that he and the defendant entered into the contract in question on February 2, 1892, that you would not be justified in finding that said February 2d contract was made between the parties, and in that event your verdict should be for the defendant. But whether such an exchange was, in fact, made between said parties in March, 1892, is a question of fact to be decided by you from all of the evidence bearing thereon.

The plaintiff assigned the giving of this instruction as one of the grounds for a new trial, and the district court after due deliberation, sustained the exception on the theory that it was error to say as a conclusion of law that if an agreement as alleged by defendant was made on March 14, 1892, then the agreement between them as alleged by plaintiff could not have been made on February 2, 1892. Considerable attention has been given by counsel in argument to the consideration of the question whether the instruction thus given was erroneous. In view of the conclusion we have reached concerning other matters involved in the appeal, and to which reference will hereinafter be made, we think it unnecessary to enter upon any extended discussion of this paragraph of the instructions given by the trial court. To say the least, we think it is open to much of the criticism offered on part of the plaintiff, and to the objection which the district court itself recognized when the matter was submitted upon the motion for new trial. If not positively erroneous in the conclusion there stated, we think it gives undue prominence to a single evidentiary fact, and was therefore liable to mislead the jury as to the force

and effect which should be given to a matter which was not in itself absolutely decisive of the rights of the contending parties.

But appellant argues with much force that, even if the instruction be held erroneous, the court was led into such error by counsel for the appellee, and that the latter is estopped from taking advantage thereof. This contention is based upon the following state of facts: It appears that upon the first trial of the case the court (then presided over by another judge) had given an instruction presenting a somewhat similar thought, and that pending the trial now under consideration the court called the attention of plaintiff's counsel to the proposition and asked if it was conceded to be correct. To this inquiry counsel replied: "We swing right around that. If their contention is sustained, then all the relations that existed between them was, as they contend, the mere question of the exchange of the interests in the Professor Grubbs and the Portland alone, why, then, we cannot recover. That is their case, if your honor please." After this statement the trial court prepared the instruction in question and made it a part of its charge to the jury. On the hearing upon the motion for new trial counsel for appellee admitted the colloquy between himself and the court, but insisted that he did not understand that he was approving the instruction. The instruction was in fact excepted to by plaintiff. Had this exception been overruled on the ground urged by the appellant, we should not be inclined to question the propriety of the ruling, but the trial court evidently found that the error had been brought about by a misunderstanding for which counsel for appellee was not entirely responsible. We take it for granted that if the trial court felt it had been led into the giving of the instruction by the fault of counsel it would have ruled differently upon this ground of the motion. That court was in a position to know and understand the real truth of the matter and all the circumstances attending the framing and

giving of the instruction far better than it is possible for us to know and understand them from the printed record, and we are not disposed to hold that any error was committed in its ruling in this respect.

II.  In support of the allegation of misconduct on part of the jury, evidence was introduced tending to show that at some time during the course of the trial one of the jurors was heard to say to other members of the panel that the parties had no right to try their case in Pottawattamie county, that they did not pay taxes there, and other language of like effect.  The court found that this circumstance did occur, and gave it as one of its reasons for sustaining the motion.  If the record disclosed no other occasion for the order, we should be inclined to hold this showing insufficient to justify the granting of a new trial; but when looked at in connection with the improper influences which appear to have been employed to affect the result of the trial, and of which we shall soon speak, we are fully satisfied that the trial court was right in holding that such expressions by and between jurors pending the hearing indicated a state of mind unfitted to give to the evidence upon the merits of the case being tried a fair and impartial consideration.  It should also be said that the fact of the suit having been brought in Iowa, and that it had become a burden and vexation to the people of a jurisdiction where neither party lived, was seized upon and used by appellant's counsel in argument in a manner well calculated to excite and fix any latent prejudice which might have existed in the minds of the jury on that score.

III.  Plaintiff also charged the defendant with misconduct prior to and during the progress of the trial in influencing public sentiment and arousing the passion and prejudice of the jury in his favor and against the plaintiff.  The trial court found this charge to be sustained, and held the fact to be a proper and sufficient cause for awarding a new

2. MISCONDUCT OF JURORS.

3. NEW TRIAL: misconduct of parties in influencing the jury.

trial. That the alleged misconduct was proved admits of no doubt whatever. Indeed, in all essential particulars it stands admitted of record. Shortly before the trial came on, Colorado, the home of these parties, had been the scene of a violent and sensational struggle between the mine operators and the forces of union labor in and about the mining districts. The disturbance was of such magnitude and the controversies springing therefrom of such character as to attract national attention, and excited animated and bitter discussion between partisans of the factions engaged therein, and to a great extent it came to be regarded on the one hand as a test of the right and power of the employers to resist the demands of organized labor, and on the other as a test of the right of labor to organize in defense of its own interests. Keeping in mind this condition of things, which was a matter of public notoriety and common knowledge, we shall better appreciate the subtlety of defendant's methods as developed in the record.

During the labor difficulties to which we have referred, the defendant, though himself a large employer, appears to have taken the side of the miners, and thereby evidently won a large degree of popularity among them as a friend of labor. About this time, or prior thereto, plaintiff accepted an appointment upon the staff of Gov. Peabody, whom the labor forces regarded as the leader or official incarnation of the forces opposed to them. Availing himself of this situation, the defendant in person or by counsel undertook to create in and about Council Bluffs, where his case was to be tried, such a sentiment of hostility to the plaintiff and friendship for himself as should operate to his benefit in the result of the trial. To that end one of his counsel secured a certified copy of the plaintiff's appointment on the staff of the governor of Colorado, and subsidized one Fisher, president of the trades and labor assembly in Council Bluffs, to undertake to create public sentiment against the plaintiff and in favor of the defendant. Proceeding to

earn his promised wage, Fisher exhibited the copy of plaintiff's commission, and circulated the story of plaintiff's relation to Gov. Peabody among the laboring men of Council Bluffs, and frequented the hotels and barrooms and places where he might reasonably expect to find people assembled, and there in loud and violent terms denounced the plaintiff and lauded the defendant. While he says he was warned by his employers not to approach any juror upon the subject and denies that he in fact did so, there is evidence from which the court could find that he did, in the presence and hearing of members of the jury, violently curse and denounce plaintiff as an enemy of organized labor, and displayed certificates and statistics which he alleged proved the truth of his statements, and said that "Burns ought to skin Doyle." That a person undertaking to perform such service would be scrupulously careful to suppress or refrain from such efforts because jurors whose verdict they were designed to influence happened to be in hearing is scarcely credible.

It is an equally fair inference that if defendant had not expected and intended that this matter should reach and influence the minds of the jury he would not have invested his money in the scheme. This work was kept up assiduously for a considerable period. There was other evidence that a member of the board of supervisors was seen drinking liquor with one of the jurors, and then and there said to the juror that the case ought not to have been brought in that county, and that it was making much public expense. While no charge is made or proven that any individual juror was corrupted or consciously influenced by improper means, the evidence strongly tends to show that some of them were exposed to outside influences which might well serve to poison their minds against the plaintiff. It is quite clearly shown that at least two of the jurors were frequently drinking intoxicants in public places during the progress of the trial, and on several occasions were drinking in intimate association with a person whose overtures to be employed on be-

half of the plaintiff had been rejected. We need not further follow the evidence. Suffice it to say that it is a fair inference therefrom that all of these various strings of influence were industriously manipulated by or in behalf of the defendant. Indeed, while the record before us does not disclose the fact except from the statement of the trial court embodied in its ruling upon the motion, it would appear that the hands of the plaintiff himself were not clean in this respect, and that more or less similar influences had been employed in his behalf. Referring to this matter, the trial court says: " I am satisfied that agents of both parties during the trial tried to use influences outside of the courtroom to affect the result in this case. Both parties say that they did it in self-defense; that they were not seeking to influence jurors, but were merely trying to maintain an equilibrium of public opinion. That this was done is shown by the Fisher matter, and by the fact that agents of the plaintiff were constantly around where the jury was, though this last is not shown by any evidence, but I am fully satisfied that it occurred. The parties refer to this as an attempt to produce psychological results. I do not know just what is meant by that. But to hire agents to persistently advocate their cause on the streets and in the hotel lobbies would be a vain effort if the parties do not believe that it will in some way influence the jury."

It was not necessary for the trial court, and is not necessary for this court, to find that the result of the trial was in truth affected or changed by these efforts. It is sufficient that it may have been. To the complaint made by the plaintiff on this ground the reply of counsel for defendant is in substance, " You, too." It is said that on the first trial there existed a strong public sentiment in Council Bluffs in favor of the plaintiff, and that this tendency was manifested in the courtroom in the presence of the jury by friends and partisans of the plaintiff cheering and applauding the arguments of his counsel. Not being able, they

argue, to avoid this handicap by applying for a change of
venue because of. the conditions upon which the default of
the defendant had been set aside, it became necessary as
a matter of self-defense to proceed to create a counter senti-
ment among the people of that community.   That we may
fairly state this somewhat remarkable proposition, we quote
from the brief of defendant as follows:

The conduct of the defendant, which is found to have
been improper, was justified by the condition of public sen-
timent at Council Bluffs and in Pottawattamie county, in
view of the inability of the defendant to apply for or secure
a removal of the cause from the county of Pottawattamie,
he having been expressly prohibited from making any such
application for removal by order of the district court.  .  .  .
At the first trial in 1901 there was every manifestation of
public feeling favorable to Doyle and hostile to Burns, and
on one occasion the audience in the courtroom burst into
applause at an incident supposed to be favorable to Doyle,
and this feeling in a measure still existed at the last trial,
for the audience loudly applauded at the conclusion of the
argument of Hon. John N. Baldwin, attorney for Doyle.
With no power to even apply for a change of place of trial
without immediately reinstating a judgment against him for
over seven hundred thousand dollars, and with *no chance
for a fair trial with crowds in the courtroom cheering for
Doyle, some effort was made to so divide public sentiment as
to give Burns something near an impartial trial.*   Doyle
had become involved in labor troubles in Colorado.   The
Cripple Creek strike of 1904, and the relations of Gov. Pea-
body thereto, are matters of general and public notoriety, of
which both the court below and this court should take ju-
dicial notice.   It appears that Doyle, although not of the
same party as Gov. Peabody, was appointed on his staff dur-
ing these labor troubles.   Defendant, in the belief that if this
was known among the laboring classes it would *tend to divide
public sentiment and either withdraw or balance the outside
psychological pressure upon the jury,* showed an authen-
ticated certificate of Doyle's appointment as colonel on Gov.
Peabody's staff to W. B. Fisher, president of the Council
Bluffs trades and labor assembly, and employed him to advise

the laboring men in the city of Doyle's relation to the strike in Cripple Creek, but specially warned him not to say anything either about the case or about Mr. Doyle in the hearing or presence of the jury. . . . The law recognizes, in one sense, the influence of public opinion. By Code, section 3505, it is provided that a party is entitled to a change of place of trial upon showing that the inhabitants of the county are so prejudiced against him that he cannot obtain a fair trial. It is not required that he show there are not twelve unbiased men in the county, but the statute recognizes that a party cannot obtain a fair trial in an atmosphere surcharged with hostility to him, even when there are many fair and unbiased citizens. Such a state of the public mind is, however, a ground for a change of place of trial, not a ground for a new trial. The only way courts can protect against the *psychological influence of a hostile public sentiment* is by a change of place of trial, but this hostility to Burns existed and he could not apply for a change of place of trial. Did the law require defendant thus to submit to be judicially robbed of from one-half to a whole million of dollars? He did the only thing he could do — *tried to divide public sentiment.*

Whether considered as a proposition of law or ethics, the fallacy of the argument thus presented is so apparent that its presentation to this court with seeming earnestness by counsel of admitted high character and deserved eminence at the bar of the State and nation is not a little surprising. The misguiding influences of unrestrained zeal of advocacy could hardly have a more striking example. Stated in brief, it is insisted, and this court is soberly asked to indorse it as permissible practice, that so long as a litigant refrains from corrupting the conscience of the individual juror he is at liberty by his hired agents and emissaries to so excite public sentiment and so impregnate the moral and social atmosphere in which the jury moves with the spirit of partisan prejudice against his opponent that the verdict shall be thereby affected and determined, and the court may not rebuke such methods by ordering a new trial. So utterly at

variance is this with all of the settled principles, maxims and traditions of the law, so subversive of public confidence in the courts as a means of establishing and enforcing justice, that its simple statement would seem to be all that is required to demonstrate its radical unsoundness. It is of little avail for a party to claim credit for refraining from bribery or other direct assault upon the integrity of jurors, if by indirect approach, by arousing hostile public sentiment and by "psychological pressure" engineered by forces employed outside of the courtroom, he deliberately undertakes to influence the verdict in his favor. Of the two methods of invading a jury room and preventing an impartial consideration of a case on trial the latter is even more dangerous than the former. Very few jurors are susceptible to bribery or to direct corrupt approach, and he who attempts such a thing ordinarily invites exposure and punishment; but it is the indirect assault upon the integrity of the verdict which is most likely to be successful; and because such attempts are not usually susceptible of clear proof, and the hidden springs of such influences are rarely uncovered, it is all the more imperative that when brought to light the court should see to it that parties employing such means reap no profit from their venture. As is well said by the trial court:

A conscientious juryman would repel with indignation an attempt to bribe him or to influence his judgment by argument outside of the courtroom. Such an effort to bribe would result in setting aside the verdict as against the party using the same, although it is likely that with the conscientious juryman such effort would only have the effect to turn him against the party using it. Yet conscientious men are, without knowing it, influenced in a far greater degree by this more subtle influence to which I refer. Cases ought to be tried in the courtroom upon the law and the evidence, and not upon the streets nor in the hotels. When such influences have been exerted in a case, I do not know whether the court should be called upon to investigate and decide

just how much effect such influences had. No human judgment can divide and number and weigh the effects. It does not cure the evil that both sides are guilty. As a matter of public policy it ought to be the law that the court will declare such efforts misconduct which will bring about a new trial without the court being able to point out definitely just how far the verdict was influenced by it or even that it was influenced at all. Otherwise where, as in this case, large sums of money are at stake, the whole administration of the law will be dragged into the dirt.

We fully coincide with the suggestion just quoted — that it is no answer whatever to say that the plaintiff adopted the same tactics and was beaten at his own game. Indeed, if this be true, it affords all the more reason why the court should not permit the verdict to stand, and, if convinced that both parties had engaged in such an unseemly contest to influence the verdict by improper means, should promptly, and of its own motion, if need be, interfere to order a new trial, not as relief to which either party under the circumstances may be entitled to demand as a right, but as a vindication of the dignity and integrity of the court, and notice to the parties and to the world that such practices will not be tolerated, and that a verdict tainted with the suspicion of improper influence will not be effectuated by the entry of judgment thereon. The office of the court is not to be degraded into that of an umpire over a contest of such nature. A strife for the most effective "psychological pressure on the jury," within the apparent meaning of that convenient euphemism, is one in which length of purse and elasticity of conscience, fertility of invention and depth of cunning, are sure to be important if not controlling factors, and just to the extent to which its influence is felt in the courtroom is the course of justice corrupted at its fountain. The citation of authorities in support of the views here expressed ought not to be necessary, but as indicating that we announce no new doctrine, we call attention to a few of the many precedents bearing thereon.

In *State v. Hascall*, 6 N. H. 352, we have a case where the defendant was under indictment on charge of crime. Pending his trial certain individuals interested in the prosecution visited hotels where some of the jurors boarded, and there discussed the merits of the case and publicly exhibited certain papers of a character to prejudice the defendant. There was no direct evidence that any juror was approached or influenced by this conduct, but on appeal the judgment of conviction was reversed on this ground alone. The court there says: " This evidence was not disproved by the government, and it established the fact of conduct of unwarrantable and reprehensible character on the part of one or more individuals connected with this prosecution, conduct which was directly calculated to have improper influence upon the jury and of a character, if tolerated, to destroy the confidence of the citizens in judicial tribunals and the fair and impartial administration of justice according to the laws of the land. We are not disposed to countenance such a procedure in this or any other case. It is of much more importance that the community should feel sure of the purity of trial by jury without bias according to law than it is that John Hascall be now sentenced even if he be guilty. The exhibition of these papers was very likely to make their contents the subject of conversation, and the jury, or some of them, may have heard some of the facts contained in them, though it never saw or heard of the papers themselves. . . . It is sufficient for this case that the exhibition of those papers was highly improper, and that there is a possibility that some of the jury may have heard something contained in them in consequence of such exhibition before the trial was had. We should not hesitate a moment to set aside a verdict obtained by a party in a civil case under such circumstances."

In *Cottle v. Cottle*, 6 Me. 140 (19 Am. Dec. 200), there was evidence tending to show that one of the parties had attempted in an indirect manner to influence one or more

of the jurors. It was argued in support of the verdict that there was no evidence that the juror was in fact influenced, but the court says: "It is insisted that the juror was not in fact influenced, and that justice has been done between the parties. It may be so, but it may be useful to the party to learn that a good cause may be injured, but cannot be promoted, by conduct of this sort, and to the public generally to know that it will be tolerated in no case whatever."

Holding to the same ruling, the Massachusetts court in *Knight v. Freeport,* 13 Mass. 218, says: "This strictness is necessary to give due confidence to parties in the results of their causes, and every one ought to know that for any, even the least, intermeddling with jurors, a verdict will always be set aside."

It has frequently been held that the question of prejudice to the losing party is not necessarily a controlling consideration, and if misconduct of this character be shown, the verdict will be set aside, even though the court may not be convinced that any prejudice has resulted. *Stafford v. Oskaloosa,* 57 Iowa, 748; *Walker v. Hunter,* 17 Ga. 414; 2 Thompson on Trials, section 2560.

What we have said makes it unnecessary for us to discuss the point made by counsel that the plaintiff should have sooner protested against the misconduct of the defendant, and that by failing so to do until after the verdict was returned he waived all objections thereto. That this rule is frequently applied will be admitted. Where the irregularity is not so flagrant as to make a vacation of the verdict a matter of public policy, and the question is simply whether the party moving for a new trial is entitled to demand it as his right, it is only just that he be estopped to complain if, knowing an irregularity, he fails to call it to the attention of the court and proceeds to take his chances on the finding of the jury. But where the objection goes deeper than the mere question of the private or personal right of the litigant, and reveals misconduct which, if left unrebuked, tends to

destroy the integrity of all jury trials, a condonation of which cannot be recognized without impairing public confidence in the administration of justice by the courts, we have no doubt of the right, indeed we regard it an imperative duty, of the trial court, when convinced of the truth of the charge, to set aside the verdict without reference to the merits of the controversy, and without stopping to inquire whether the losing party has spoken with the promptness which his duty in the premises may have required.

Neither is there any merit in the plea, frequently reiterated by counsel, that the terms upon which the default judgment was set aside deprived appellant of the right to demand a change of venue, and that he was thereby forced to employ these extraordinary and questionable methods as his only salvation from "judicial robbery." Even if this interpretation of the effect of that order be correct, it affords not the slightest justification for the conduct thus sought to be excused. Moreover, we are not at all satisfied that the order complained of should be thus rigidly construed. The end sought to be secured seems to have been to require the appellant, if he would have his default set aside, to submit to a trial of the cause upon its merits in the courts of this State, and to that end it was made a condition that he should dismiss certain suits or proceedings begun by him in Colorado and make no attempt to remove this case to another forum. In other words, he was required to consent and did consent that the case should be here tried and disposed of in the same manner and subject to the same conditions which would obtain if the parties were both residents of Pottawattamie county and the action had been regularly and properly begun in its courts. If it be a fact that, following this order, popular prejudice or passion has become so excited that a fair trial cannot be had in the local jurisdiction, we now see no reason why a change of venue to another convenient county may not be applied for and granted without reinstating the default judgment.

IV. On the first trial of this case, while there was a general verdict for plaintiff for a considerable sum, there seems to have been a special finding against his claim to have an interest in the proceeds of the sale of the Devil's Own mine. A judgment having been entered in his favor for the amount found to be due him, an appeal was taken by the plaintiff, who secured a reversal of the judgment and a new trial. On the case being remanded to the district court, defendant, relying on the effect of said special finding, moved for a judgment in his favor as to the stock received by him in payment for the Devil's Own mine. The court denied the motion, and error is assigned on the ruling. A proper consideration of the question thus raised would require an examination of the record of the former trial, and an inquiry whether this special finding was in any manner affected or controlled by other findings of the jury or rulings of the court. Counsel have not seen fit to bring that record before us, and we do not feel at liberty to import it into the consideration of the present appeal. The record as presented is insufficient to overcome the presumption in favor of the ruling of the trial court, and the error assigned thereon cannot be sustained.

The order for a new trial has ample support in the record, and it is *affirmed*.