IN RE ESTATE OF EDMUND I. WHITEHOUSE.

MRS. E. I. WHITEHOUSE, Proponent, Appellant, v. JAMES E. WHITEHOUSE, Contestant, Appellee.

No. 43689.

92

Maʀᴄʜ 16, 1937.

Davis, McLaughlin & Hise and Cosson, Stevens & Cosson, for appellant.

Charles W. Bowers and Missildine & Witmer for appellee.

Doɴᴇɢᴀɴ, J.—Edmund I. Whitehouse was born in London, England, came to this country with his parents when about four- teen years of age, and settled on a farm near Grimes, Polk county, Iowa. It appears that he continued living at Grimes and was engaged in farming there until sometime after reaching manhood, when he moved to Des Moines and engaged in the loan business. In 1892 he was married to Effie Van Dorn and about

1894 James E. Whitehouse, the contestant herein, was born as the issue of that marriage. About seven or eight months after the birth of the child Mrs. Whitehouse died, and thereafter the child, James E. Whitehouse, went to live with his aunt, a sister of his deceased mother. This aunt lived for a while in Des Moines, Iowa, but when the child was about three and a half years of age she moved to Colorado and took him along with her. After living in Colorado for over a year they returned to Des Moines, lived there a short time, again went to Colorado, and, about 1909, moved to Canada. James E. Whitehouse continued to live with this aunt for several years thereafter, and at all times since 1909, he has been a resident of Canada. At the time of the death of his father, and for some years previous thereto, he was a resident of Calgary, in the province of Alberta.

Edmund I. Whitehouse lived in Des Moines continuously from the time of the birth of his son until about 1911 or 1912, when he made a trip to England and remained there until some time after the close of the World War. It does not appear clearly from the record just when he returned to this country, but it is apparent that he was still residing in England in the fall of 1919, and that he returned to Des Moines sometime prior to August, 1925. During all the time he lived in Des Moines prior to going to England, he was engaged in the loan business, and he was also the owner of real estate. While he was in England his affairs were attended to by the Security Loan and Investment Company of Des Moines, and appear to have been under the direct supervision of W. H. Barnard. After returning from England Mr. Whitehouse continued his loan business and also continued to own real estate consisting of farm land, and Mr. Barnard, who had ceased his connection with the Security Loan & Investment Company, appears to have looked after some of Mr. Whitehouse's business. At the time of his death, which occurred on June 20, 1935, Mr. Whitehouse was 79 or 80 years of age.

The appellant, Mrs. E. I. Whitehouse, was born in Illinois, and at the time of the trial, in the fall of 1935, she was 62 years of age. She moved with her parents to Iowa where she resided on a farm, went to country school and later to a high school at Panora, where she received a teacher's certificate and thereafter taught in the grade school at Bagley for five years. While attending the Moody Bible Institute at Chicago she met and married Avery Wingert, a Presbyterian minister, and later moved to

Churdan, Iowa, where her husband was pastor of the Presbyterian church. A son, Leo, was born as the issue of this marriage, and, about seven months after his birth, her husband left her and she secured a divorce. She left Churdan and went to Bagley where she conducted a millinery store for some time, and about 1921 she came to Des Moines where she later engaged in the business of conducting rooming houses. In her testimony Mrs. Whitehouse stated that she first met Mr. Whitehouse in Des Moines in 1912; that she met him again later in the Union Station at Des Moines; and that she did not again see him until about August, 1925. This is the only direct testimony in the record as to any acquaintance between Mrs. Whitehouse and Mr. Whitehouse prior to 1925, and it is quite apparent that, if there was any acquaintance between them before 1925, it was of a very casual nature. According to the testimony of Mrs. Whitehouse, Mr. Whitehouse rented a room in a rooming house conducted by her sometime shortly after this meeting in August, 1925, but there is also evidence in the record which the appellee contends tends to show that she did not meet Mr. Whitehouse and that he did not begin rooming in her house until sometime in 1926 or 1927.

After the contestant, James E. Whitehouse, went to Canada with his aunt, the record does not show any communication between him and his father until sometime prior to February 15, 1911. At that time the contestant, James E. Whitehouse, wrote a letter to his father from Strathmore, Alta., Canada, in which he refers to having received a letter from his father dated January 23d. From the contents of the son's letter it would appear that the father had asked or suggested that the son return to Iowa and go on a farm. In his letter of February 15, 1911, the contestant told his father that, on account of his health, and because of wanting to go through college, and because he did not want to become a farmer, he would not return to Iowa. Under date of February 20, 1911, Edmund I. Whitehouse wrote a letter in reply to the son's letter of February 15th, in which he urged the son to consider his decision and advised him to change his mind and to write him at once to that effect. Following this letter there seems to have been no correspondence or communication between the father and son until 1933. Edmund I. Whitehouse continued to live in a rooming house conducted by the appellant from the time he first went there until his death.

On the 12th day of December, 1927, Edmund I. Whitehouse went to the office of Mr. Barnard and asked Barnard and his sister to witness an instrument written out in longhand in his handwriting, which he told them was his last will and testament. After this instrument had been executed by him and witnessed by Mr. Barnard and his sister, it was sealed up in an envelope on which Mr. Whitehouse endorsed on the outside the statement,—"Will. Edmund Isaac Whitehouse, December 12, 1927." This envelope and the will contained therein were left with Mr. Barnard for safekeeping, and remained in his possession until August 27, 1932, when it was turned over to Mr. Lynch, Mr. Whitehouse's attorney for safe-keeping, and remained in his possession until it was filed in the office of the clerk of the district court of Polk county, after Mr. Whitehouse's death. This will, after giving the sum of $5.00 to his son, James Edmund Whitehouse, left all of the testator's property to "my dear friend, Nancy Mae Wingert" and appointed her and W. H. Barnard executors.

On December 5, 1933, Mr. Whitehouse and Mrs. Wingert made a trip from Des Moines, Iowa, to Princeton, Missouri, where they were married. No publicity appears to have been given to this marriage and many of the witnesses who saw both of these parties quite frequently after that time, testified that they had no knowledge that there had been a marriage until after the death of Mr. Whitehouse.

After the death of Edmund I. Whitehouse the will here involved was filed in the office of the clerk of the district court of Polk county, and James E. Whitehouse filed objections to its admission to probate on the ground of the mental incapacity of Edmund I. Whitehouse to execute a valid will, and on the further ground that the said alleged will was procured to be executed by the fraud, duress and undue influence of Nancy Mae Wingert, now purported to be Mrs. E. I. Whitehouse. The case was tried to a jury which returned a verdict in favor of the contestant, and judgment was entered thereon. A motion for new trial and exceptions to instructions given were filed and, upon hearing, were overruled by the trial court. From the judgment entered and from all adverse rulings, the proponent appealed.

A great many allegations of error are set out as grounds for reversal. Most of these allegations of error, however, either directly or indirectly allege the insufficiency of the evidence to sustain the verdict returned by the jury. Because we have reached

the conclusion that the case will have to be remanded for a new trial, as will hereinafter appear, we deem it inadvisable and improper to discuss the evidence at this time. Upon a retrial of the case the evidence then introduced may or may not be the same as that presented on the trial from which this appeal was taken. We shall, therefore, omit any discussion as to the sufficiency or insufficiency of the evidence to sustain a verdict either as to mental incapacity or undue influence, and proceed to a consideration of the alleged error in the ruling of the trial court in refusing to grant a new trial on the ground of newly discovered evidence.

I. Following a general verdict of the jury that the purported will was not the valid will of Edmund I. Whitehouse, the proponent, within due time, filed exceptions to instructions given and a motion for new trial. Before hearing was had upon such exceptions or motion, the proponent filed an amendment to her motion for new trial because of newly discovered evidence since the trial and since the filing of her original motion. The newly discovered evidence alleged consisted of misconduct on the part of the contestant, in the improper use of money, in the employment of persons to induce others to become witnesses, and in promising the payment of money to the extent of a large part of the estate, contingent upon the contestant's being successful in setting aside the will. In connection with and in support of this motion the proponent set out the affidavits of various witnesses who had testified on the trial of the case and, in addition thereto, some of these witnesses were examined upon the hearing on the motion. It was thus made to appear that the witness, Fred Miller, had received a check for $150 from the contestant in July preceding the trial of the case, and that in the letter accompanying said check the contestant told said Miller that he would send more if he could raise it and that if Miller found it necessary to give Pierce Witmer ''a good slice especially to carry this on, you have the power and my permission to do so.'' The letter also contained the statement: ''Also to yourself or anyone else that may help you finance, you may find it necessary to give up to fifty per cent of the estate, and if so, it is O. K. by me. The main thing is to win it and put that woman where she belongs.'' The affidavit of the witness, Harold, stated that he had talked with the contestant and that contestant had asked him to be a witness and said to him that, ''If I would be a witness he

would see to it that I got my mileage and witness fees and that he would give me enough extra to make me feel good.'' The affidavit of the witness, Ewing, stated that the contestant had requested him to be a witness and to help get other testimony and witnesses, and that ''I was told that if I would be a witness and help that I would get my mileage and witness fees, and in addition, would be well paid for my work.'' The affidavit of the witness, Edith Hellberg, stated that the contestant had asked her to be a witness and had asked her and her brother to help get other testimony, and that one time when he was talking with her he held her hand a little longer than was necessary ''and told me that he wanted me to be a witness and help get witnesses and evidence for his trial, and that he would see that I was well paid for what I did for him.'' The affidavit of the witness, McFarland, stated that he resided in Davenport, Iowa, preceding the trial and that he was subpoenaed to come to Des Moines by the contestant; that he helped get witnesses before the trial and was in and about the courthouse all during the trial; that during the trial and since the trial he talked to a number of witnesses who appeared for contestant who told him that Whitehouse had promised to give them their mileage and witness fees and something in addition; that some of them used the expression that they were to receive enough to make them feel good, others that Whitehouse promised to make it worth their while, and others that he promised to see that they were well paid for their work. This affiant also stated that there were a large number of witnesses in and about the court room to testify for the contestant and that they were always talking in favor of the contestant and against the proponent, and that he was sure that all these persons talking to different people created a favorable sentiment for the contestant and a hostile and unsympathetic attitude toward the proponent. The witness, Sherman Woodrum, in his affidavit stated that before the trial he had planned to visit his sisters in Louisville, Kentucky; that the contestant came to him and asked him to be a witness and that, when he told contestant that he intended to leave for Louisville, that he did not have any money but was a good hitch-hiker, and that, if he did not succeed that way, he would know how to ride a freight train, the contestant told him in substance: ''You stay here; we want you as a witness and we want you to help and get other witnesses for us and we also want your boy to be a wit-

ness, and if you stay I'll see to it that you get your mileage and witness fees and that your boy gets his mileage and witness fees and we can arrange for the boy's board and room, and I'll fix that all right, and I'll see that you get to go to Louisville and back.'' The witness, Art Hellberg, in his affidavit stated that before the trial the contestant told him that he wanted him to be a witness and help get other witnesses and that if he would help ''he (contestant) would see that I got a 'cut-in' on it for what I did for him.'' The witness, Hoover, in his affidavit stated that the contestant called on him to find out what he knew about the case, and when he (affiant) had told the contestant what he knew, contestant ''told me that they would take care of me if I would testify favorable to their side''; that affiant did a good deal of investigating and work for the contestant, and that he did not expect or understand that he would get any pay, other than mileage or witness fees, unless Whitehouse won the suit.

There was also attached to the motion an affidavit of one Earl A. Webb who stated that sometime after the death of testator he was at the place of business of proponent; that there were two women in the place of business and that one of these women was Laura Mingus, who testified as a witness for the contestant, and that he heard her say to the other woman, who was Mrs. Whitehouse, in a loud and boisterous manner: ''By God, I'll have some of that $100,000 estate yet.'' There was also filed with the motion the affidavit of one W. P. Petty, who stated that he was subpoenaed as a witness on the trial and attended court three different days, but was not called as a witness, and on one of these days the contestant came out to where he was sitting and told him: ''Now, you stay around until you are called and sign up every morning as a witness, and we are going to win this trial and I will do the right thing by you after we are through.''

The statements made in the letter of the contestant to the witness, Fred Miller, are undisputed. The evidence taken at the hearing on the motion for new trial also shows that, after the trial of the case, Miller consulted an attorney in regard to a settlement with Whitehouse; that this attorney interviewed the attorneys for the contestant; and that one of the attorneys for the contestant, in that interview, stated that there was a time when they could have gotten a ten per cent settlement for Miller for the detective work, expenses, etc., that he did and time spent in this case; that the contestant was willing to pay Miller that

amount; but that Miller would not take it, and, the expression was made, that he was very foolish for not taking it when they could have gotten it for him.

It is the contention of the appellant that a new trial should be granted because the application comes within the provisions of subdivisions 2 and 7 of section 11550 of the Code, which are as follows:

"2. Misconduct of the jury or prevailing party. * * *

"7. Newly discovered evidence, material for the party applying, which he could not with reasonable diligence have discovered and produced at the trial."

■■■ Appellee insists that a new trial should not be granted on the grounds presented by the amendment to the motion, because the granting of a new trial is largely within the discretion of the trial court; because a new trial should not be granted unless the newly discovered evidence is such as will likely lead to a different result; because a new trial will not be granted on newly discovered evidence which is merely impeaching in character; because a party seeking a new trial on the ground of newly discovered evidence must show diligence; because a new trial will not be granted to enable a party to examine a witness on matters not referred to when the witness was on the stand in the trial of the case. It may be conceded that all of these considerations are involved in deciding a motion for a new trial on the ground of newly discovered evidence. We do not think, however, that the newly discovered evidence here presented is such that we can say that it is not likely to lead to a different conclusion; or that it is merely impeaching in character; or that there has been a lack of diligence in discovering it; or that a new trial will merely allow the proponent to examine the witnesses on matters not referred to when they were on the stand in the trial of the case. In this case, the contestant is the only son of the testator and the only person having such legal interest as to entitle him to contest this will. There was no reason at the time of the trial for requiring the appellant to assume that the various witnesses called by contestant had any personal interest in the outcome of the case, and we cannot assume that the verdict would have been the same if the matters alleged in the newly discovered evidence had been before the jury.

The situation here presented is not such as ordinarily comes

before a court in connection with a motion for a new trial; in fact, neither of the parties has presented a case directly in point, and we may assume that, if there was such a case, it would have been cited. We think, however, that there is ample in the authorities to show that courts will not confine themselves to nice distinctions and intricate technicalities when confronted by a condition such as is shown by the motion and affidavits for a new trial in this case. In Haines v. Lewis, 54 Iowa 301, 305, 6 N. W. 495, 496, 37 Am. Rep. 202, there was involved an agreement by defendant with the prosecuting witness in a criminal case, under which, if the defendant were convicted, the prosecuting witness was to join in asking a pardon for him; and, if such pardon were granted, such prosecuting witness was to receive certain remuneration as settlement for damages which might also be claimed by her in a civil suit. In refusing to recognize such an agreement, this court, while expressly holding the attorneys and parties innocent of any intention of wrongdoing, said:

"But no honesty of intention upon their part would justify us in adopting a rule which would allow persons charged with crime to practically buy up the witnesses for the State."

In the case of Doyle v. Burns, 138 Iowa 439, 452, 114 N. W. 1, 5, there was involved the question of granting a new trial, because of the attempt on the part of one of the parties to create a public opinion which would naturally have influence on the attitude of the jurors. It was contended by such party that whatever was done was for the purpose of counteracting similar efforts made by the other side. In holding that a new trial should be granted, this court said:

"Indeed, if this be true, it affords all the more reason why the court should not permit the verdict to stand, and, if convinced that both parties had engaged in such an unseemly contest to influence the verdict by improper means, should promptly, and of its own motion, if need be, interfere to order a new trial, not as relief to which either party under the circumstances may be entitled to demand as a right, but as a vindication of the dignity and integrity of the court, and notice to the parties and to the world that such practices will not be tolerated, and that a verdict tainted with the suspicion of improper influence will not be effectuated by the entry of judgment thereon. The office of

the court is not to be degraded into that of an umpire over a contest of such nature."

The case of Boston Bar Association v. Greenhood, 168 Mass. 169, 46 N. E. 568, was an action for the disbarment of an attorney. One of the grounds for disbarment alleged was that the attorney had assisted in procuring an arrangement by which a woman, who had been given a legacy under a former will of testator, should help in establishing the invalidity of a subsequent will under which she received nothing, and, in addition to her legacy under the first will, was to receive other compensation. In that case the court said:

"The temptation held out by this arrangement, and the danger that it would lead to a trial in part upon untrustworthy testimony, bring it perilously near, if not within, the rule that forbids the making of similar agreements on grounds of public policy."

In re O'Keefe, 49 Mont. 369, 142 Pac. 638, 641, L. R. A. 1915A, 514, was likewise a disbarment proceeding, in which an attorney was charged with having aided in securing an arrangement by which a witness was to receive more than the ordinary witness fees and mileage, and the court said:

" 'If the rule be established that such inducement be permissible, the floodgates of fraud and bribery will be thrown wide.' * * *

"The material question is what effect such promises are calculated to produce upon a witness or upon his testimony, and it cannot be gainsaid that this effect is not in the direction of plain, unvarnished truth. In such matters the exigencies of any given cause must yield to the larger demands of public good, and we decline to hold that it is proper in this state for an attorney to buy testimony, whether true or false."

We do not wish to be considered as holding that, in the promises which the contestant is alleged to have made to the different witnesses, he actually intended and was attempting to bribe them to commit perjury; nor should we be understood as holding that any of these witnesses actually did commit perjury. What we do hold is that, even though innocent, the conduct of the contestant was improper; that, even if it did not amount to an

inducement to commit perjury, it did create a situation where all of these witnesses, to whom promises were made, were exposed to the temptation to do so. Even if these witnesses did not commit perjury and were not consciously influenced by the promises thus made, such offers of remuneration, contingent on the success of the party for whom they were testifying, might easily cause them to color their testimony and present it in a light more favorable than it would have been given if such promises had not been made. The proponent was entitled to a fair trial of the issues involved in this case. In view of the promises made by the contestant and the secret arrangements which appear to have existed between him and some of his witnesses, it is at least very doubtful that a fair trial could have been had without opportunity to cross-examine these witnesses as to the matters disclosed in the affidavits. We feel constrained to hold that the motion for a new trial should have been sustained, and that, in overruling it, the trial court was in error.

II. Following the death of testator and the filing of the will for probate, the proponent, on her application, was appointed special administratrix pending the probate of the will. The verdict of the jury on the trial of the case was returned on the 3d day of December, 1935, and judgment on the verdict was entered on December 6, 1935. On December 12, 1935, the contestant filed an application for the appointment of a general administrator. The application alleged the appointment of the special administratrix, the filing of an inventory by her; that the trial of the will contest had resulted in a verdict and judgment finding that the alleged will was not valid; that petitioner believed there might be other items of property belonging to the estate not shown in the inventory; that, because of the litigation between petitioner and proponent, petitioner believed it would be for the best interests of the parties concerned that a disinterested and capable administrator be appointed to administer the estate; and that, when an administrator was appointed, the special administratrix should be required to make her final report and be discharged. On the 17th day of December, 1935, Nancy Mae Whitehouse, the proponent in the will contest, filed her resistance in which she alleged that the verdict of the jury and judgment of the court rendered in the will contest were not final, but were subject to a motion for new trial which would be filed in due time; that, if such motion for new trial should be over-

ruled, appeal would be taken immediately to the supreme court; and that, until final judgment shall have been entered upon appeal or in the proceedings in the trial court, the special administration should be continued. Said resistance also alleged that the statements of the application for appointment of administrator were insufficient to justify the removal of the special administratrix or the appointment of an administrator; that she was the surviving spouse of the decedent and entitled under the law to preference if administration were to be granted.

Hearing was had on the application and the resistance thereto, on the 19th day of December. No evidence was received and, on the 24th day of December, the court entered an order finding it for the best interests of the estate that a general administrator be appointed, that such administrator be a disinterested party, and appointing H. W. Slayman as such administrator. Thereafter, on December 26, 1935, said Slayman filed an application asking that C. S. Missildine, Charles W. Bowers and H. Pierce Witmer be appointed as his attorneys and, on the same day, without notice to the surviving spouse, the court entered an order making such appointment. On December 30, 1935, the surviving spouse, being the proponent in the will contest, filed her application for a stay order in this court, and, on the same day, such application was granted and an order entered staying all proceedings in the district court under said appointment of H. W. Slayman; and it was further ordered that Nancy Mae Whitehouse continue to act as the special administratrix for the purpose of conserving the estate pending her appeal to this court.

·An appeal was taken from the order appointing said H. W. Slayman as administrator, and ordering that the special administratrix file her final report and be discharged. That appeal has been argued and submitted along with the appeal in the will contest.

█▌█ Without going into an elaborate discussion of the several grounds alleged in support of the allegation that the court erred in entering the order appealed from, we think it sufficient to say that the allegations that a jury had rendered a verdict finding the will in question to be not a valid will, and that judgment had been entered on such verdict, were not sufficient to present a situation where the special administration should be terminated and a general administrator appointed. Under our statute, sec-

tion 11885, it is provided that, "When, from any cause, general administration or probate of a will cannot be immediately granted, one or more special administrators may be appointed to collect and preserve the property of the deceased." Under this statute, the appellant was appointed special administratrix of the estate of her deceased husband, and the language of the appointing order was that, "she be appointed temporary administratrix pending the probation of said will." The fact that the trial of the will contest had resulted in a verdict and judgment finding the instrument in question to be not a valid will, was not a termination of the litigation pending, and was not a final determination of the invalidity of the purported will. The conditions under which the special administratrix had been appointed were still in existence, and a general administrator could not be appointed until it was finally determined that the instrument proposed by Mrs. Whitehouse was not a valid will. Until such litigation was finally terminated and it was finally determined whether the said instrument was a valid will or was not a valid will, there could be no general management of the affairs of the estate, either under the provisions of the will or under a general administration. It seems elementary that, under the situation existing at the time that the order here involved was entered, the appointment of a general administrator was at least irregular and improper, if indeed it was not utterly void. As said in 23 C. J. 1031, 1032:

"While there may of course be a grant of administration with the will annexed, and the law also provides for various kinds of special administration which recognizes the existence or possible existence of a valid will, it is a necessary prerequisite to a grant of ordinary administration on the estate of a decedent that he should have died intestate. A grant of such administration necessarily involves, and is based upon, a finding or adjudication of intestacy, but such a determination does not preclude any party in interest from subsequently instituting proceedings to establish a will. A grant of administration as in case of intestacy, where the decedent left a valid will which was not known of at the time, but is afterward produced and probated, is voidable only and not void; *but general letters of administration granted during the pendency of a contest respecting the probate of an alleged will are utterly null and void,* and cannot be sup-

ported as a grant of administration *pendente lite;* and letters of administration issued after a will has been admitted to probate and an executor qualified, and while the action of the court in respect to the will remains unrevoked and unreversed, would seem to be necessarily void.'' (Italics ours.)

On the appeal from the verdict and judgment in the will contest, and rulings of the court in connection therewith, because of error of the trial court in refusing to grant a new trial, the case is hereby reversed and remanded for a new trial. On the appeal from the order appointing an administrator and removing the special administratrix, such order is also hereby reversed. —Reversed and remanded.

RICHARDS, C. J., and ANDERSON, HAMILTON, STIGER, KINT-ZINGER, PARSONS, and MITCHELL, JJ., concur.