IN RE ESTATE OF JENNIE E. EIKER.

LULU MILLER, Appellee, v. LYLE DOAN, Appellant.

No. 45987.

316

NOVEMBER 24, 1942.

REHEARING DENIED APRIL 9, 1943.

D. M. Kelleher and Fred J. Keefe, both of Fort Dodge, for appellant.

Maher & Mullen, of Fort Dodge, for appellee.

STIGER, J.—The will, executed November 23, 1939, devised the home of testatrix, valued at $2,500, to appellee, and after making eleven personal bequests aggregating about $1,700, bequeathed the residue of the estate, estimated value about $15,-000, to appellant, Lyle Doan, who was not related to testatrix. He was named executor without bond.

I. Appellant's first assignment of error is that the court erred in overruling his motion to withdraw from the consideration of the jury the issue of undue influence because of insufficient evidence to warrant its submission. The burden of proof was on contestant. In will contests the burden does not shift though a fiduciary relation exists. Reed v. Reed, 225 Iowa 773, 281 N. W. 444.

We have often stated that to be undue, influence must operate at the time the will is made and must dominate and control the making of the will; that it must be such as to make the will express the purpose and intent of the person exercising the influence and not the purpose and intent of the testator; that undue influence is not established by proof of opportunity to exercise and disposition to do so or by proof of persuasion and request. Worth v. Pierson, 208 Iowa 353, 223 N. W. 752; In re Will of Richardson, 199 Iowa 1320, 202 N. W. 114; Cookman v. Bateman, 210 Iowa 503, 231 N. W. 301; In re Estate of Johnson, 222 Iowa 787, 269 N. W. 792; In re Estate of Mott, 200 Iowa 948, 205 N. W. 770; In re Will of Johnson, 201 Iowa 687, 207 N. W. 748.

We have uniformly held that the fact of the exercise of undue influence cannot be established by proof of declarations of the testator made before or after the execution of the will, such declarations not being substantive evidence of undue influence. There must be some substantive evidence of the exercise of undue influence before declarations may be considered. Declarations which do not constitute a part of the res gestae are hearsay but are admissible to show the state of mind of the testator, his susceptibility to and capacity to resist undue influence.

If there is some direct or substantive evidence of undue influence, the fact that the last will differs from a previous one, that it is unnatural or inequitable, may be considered as tending to show the influence operated on the mind of the testator. Johnson v. Johnson, 134 Iowa 33, 111 N. W. 430; Zinkula v. Zinkula, 171 Iowa 287, 154 N. W. 158; In re Will of Diver, 214 Iowa 497, 240 N. W. 622; In re Estate of Rogers, 229 Iowa 781, 295 N. W. 103.

Undue influence may be established by circumstantial evidence. In re Will of Busick, 191 Iowa 524, 182 N. W. 815; In re Estate of Ensminger, 230 Iowa 80, 296 N. W. 814. In the instant case there is no direct evidence of undue influence.

In deciding the issue presented by appellant's first assignment of error, appellee is entitled to have the testimony considered in the light most favorable to her.

Appellant forcefully insists appellee did not introduce any substantive evidence that he exercised undue influence. We will set out the evidence appellee claims makes out at least a prima facie case of the exercise of undue influence.

At the time of the trial appellant, Lyle Doan, was thirty-four years old. He has been an employee of the Fort Dodge Gas and Electric Company since prior to 1932. He first met Mr. Eiker in 1932, who called on him at the office about cashing his dividend checks issued by the company and about some stock. In 1934, Mr. Eiker again called on appellant about the dividend checks. In 1936, Mr. Eiker's health began to fail and appellant would take him to the gas and electric company office, where he would cash his dividend checks, and would then take him to various places so he could pay his bills. In the fall of 1937, Mr. Eiker became confined to his home because of illness and requested appellant to come to the house every month and get the dividend checks, cash them, and pay his bills. Appellant complied with this request and the arrangement continued until Mr. Eiker's death. Shortly before his death, in 1938, he asked appellant to aid him in deeding his home and in transferring his gas-and-electric stock to Mrs. Eiker. Appellant went to the office of a Fort Dodge lawyer, who made out a deed to the home and arranged for the transfer of the stock. Lyle Doan testified:

"The night before Mr. Eiker died, I stopped in on my way home from work. Mr. Eiker was lying on the couch and we were talking. Mr. Eiker said he had always trusted me, that there were a lot of people he didn't trust, that he realized Mrs. Eiker was going to be alone, and asked me to continue to do everything I could to see that she was taken care of and made as comfortable and as happy as possible. He said that he wished I would continue looking after those bills. I was a pall bearer at the funeral."

He continued to collect the dividends for Mrs. Eiker and to pay certain bills, and on Sundays Mr. and Mrs. Doan and Mrs. Eiker would have dinner together at some public place. During the summer months of 1938 and 1939, Mr. and Mrs. Doan would occasionally take Mrs. Eiker for short automobile rides. After the death of Mr. Eiker, appellant would, about

once a week, stop at Mrs. Eiker's home either in the morning or afternoon to visit with her for five or ten minutes. He would make these visits while out on company business which required him to drive about the city. On November 22, 1939, testatrix phoned the attorney who made out the deed and transferred the stock to come to her home and draw her will. He testified he had known her for twenty years, had drawn a will for her in 1936, but stated he did not keep copies of wills drawn in his office, and had some other business relations with her and her husband. In compliance with the telephone message, he went to Mrs. Eiker's home about 9:00 o'clock in the morning. Mr. Doan was at the residence. He further testified:

"Q. Now did you see Lyle Doan up there that day? A. Up where, what day? Q. At Eiker's? A. I am not positive; my recollection is when I went there first in the morning he was in the yard and took me to the house and introduced or opened the door for me to go in and see Mrs. Eiker; introduced me to the room—Q. Not to Mrs. Eiker? A. I knew Mrs. Eiker when she was playing in the church and I was trying to sing in the choir. Q. Anyway he introduced you to the room? A. Yes, sir. * * * Q. You didn't tell Lyle Doan you were going to be there first at nine-thirty? A. I don't think I did. Q. You don't think you communicated to Lyle Doan about Mrs. Eiker's will at all? A. I know I didn't. Q. But Lyle Doan was there all ready to receive you when you got there that morning? * * * Mrs. Eiker had a telephone and knew how to use it? You met Lyle Doan that morning and he took you to Mrs. Eiker's? A. I told you the facts."

Mr. Doan's version of the meeting with the attorney at Mrs. Eiker's home is as follows:

"I saw Mr. Price at the Eiker residence. My car had been there not over ten minutes. I was just leaving when Mr. Price came in. I did not go back in. I continued on with my business. I did not know that his business * * * at the Eiker home had anything to do with the making of a will. About two days later George Gosnell [a witness to the will] happened to be in the office and he said, 'I see where the old lady across the

alley made up a will,' and he told me that Mr. Price [the lawyer] had come over and called him to the house. That was the information that I had. * * * The only time I ever saw Mr. Price at the house was in November, 1939. I may have said, 'How do you do,' or something like that, just as I was going out the door. I did not stop. I kept on going. I passed Mr. Price as I was leaving the house. I said nothing more to him than, 'How do you do.' I had been there some time before Mr. Price came. I did not know he was coming. * * * I still say that I did not know that he was coming or what he was there for. I do not recall how long it was before I was there again. It was not the same day. At the time that I saw him, I think it was about the middle of the morning. I made no inquiries about what Mr. Price had been there for. I saw George Gosnell in the office of the Gas & Electric Company. I have known Gosnell for some time and knew that he lived next door. I did not know that Gosnell had been a witness until he told me two days later. My business that day took me in that neighborhood.''

Ray Johnson, a banker in Fort Dodge, was appointed guardian of Mrs. Eiker on January 27, 1941, on the petition of appellee. In January, prior to his appointment, he had a conversation with Mr. Doan. Mr. Johnson testified:

''I recall a conversation with Lyle Doan in front of the Eiker place in January, 1941. Lyle Doan said, 'Something has to be done about Mrs. Eiker. She needs a guardian. I think one of us ought to do something about it.' I said, 'I don't think it is up to us to appoint a guardian. She has relatives.' He said, 'They don't seem to be doing much, but they will probably be in and pitching when she has passed away, for her money.' I told him I wouldn't do anything about it.

''After I was appointed guardian, I got her safety deposit box key. I took into possession the box and its contents. In the box I found the will, Exhibit 'A.' I found no other will. I talked with Lyle Doan about Exhibit 'A' in the bank a short time after I was appointed guardian. He asked me how I was getting along with Mrs. Eiker and I answered, 'Everything is going fine.' He asked me if I found a will in her safety deposit box, in which he was named Executor, and I said that I did. He

said, 'I just wanted to make sure you had possession of that will.' ''

Appellant testified:

''I had a conversation with Ray Johnson in which I told him that I thought a guardian should be appointed in January of this year. I told him that I·thought the guardian should be either Johnson or myself.''

After Mr. Doan left the Eiker residence, the attorney interviewed Mrs. Eiker about her will. He testified:

''Mrs. Eiker had some three sheets of paper written on both sides; all the information with·reference to the contents of the will as she wanted it drawn.''

He further testified that Mrs. Eiker told him that she had left the major portion of her estate in a prior will to appellee; that the reason for the change she made in her will was that she and appellee did not get along very well; that she spent all of her days over at her daughter's looking after her daughter's baby, and that she would leave early in the morning and return late at night, and that she had taken a position in Fort Dodge; that she wanted to remember Doan substantially because he was closer to her now than any other person. She stated that Mr. Eiker, in her presence, said to Mr. Doan, ''When I am gone, you continue to look after my wife, Jennie, as you looked after me.''

Appellant was not present when the will was executed. This lawyer was attorney for Doan when he filed his answer to objections to probate of the will but took no part in the trial.

At the time the will was executed, testatrix was forgetful, would be confused with regard to simple business transactions, worried about money matters, was frail, thin, and weak, with uncertain muscular control. Dr. Bruce testified that in October 1939, Mrs. Eiker was unstable, emotional, forgetful, complained of·dizziness and insomnia, all of which conditions were symptoms of arteriosclerosis. She was eighty-one years old when she signed the will.

Doan advised her to sell her stock in a certain company and advised the purchase of a gas burner which she installed.

As stated in Monahan v. Roderick, 183 Iowa 1, 6, 166 N. W. 726, 727:

"Conduct which might be insufficient to unduly influence a person of mental strength might be sufficient to so operate upon a failing mind."

We cannot hold as a matter of law that this evidence, with the reasonable inferences that might be drawn therefrom, did not tend to show that undue influence was exercised upon testatrix by appellant. There being evidence from which a jury could find that appellant exercised undue influence, we will refer to evidence that tends to sustain the charge the will was procured by undue influence.

Appellee lived in Fort Dodge with her mother and her aunt and uncle, Mrs. and Mr. Eiker, from the time of her father's death to her marriage, at which time she moved to Minneapolis. After the marriage, friendly relations continued between appellee and her aunt Mrs. Eiker, each writing and visiting the other. Mr. Eiker died in April 1938, at the age of eighty-six years. Appellee went to Fort Dodge and aided Mrs. Eiker in caring for her husband during his last illness. In August 1938, testatrix wrote appellee that they were both alone and that she wanted and needed her:

"I can give you a nice comfortable home with me. And I think I can give you $10.00 per month * * *. It is lonely for me alone here and I need someone younger than I am to be help and company to me, as I grow older."

The appellee accepted the invitation and lived with the testatrix from September 1938 to October 6, 1939, at which time she obtained employment in Fort Dodge and moved to the home of her mother and thereafter saw very little of her aunt.

In 1918 testatrix executed a will leaving legacies to appellee and her children, and the remainder of her estate to her husband with a provision that if she and her husband died at the same time all of her property would go in equal shares to appellee and her children. In 1927 a similar will was made by testatrix. In 1938 testatrix made a will leaving all of her prop-

erty to appellee "providing that she is making her home with me at the time of my death." These wills were drawn by Mr. Maher, of the law firm of Maher & Mullen, who had known testatrix for many years.

Before and after the will was made, testatrix stated she intended to leave all her property to appellee. After the will, she stated she had made a will leaving all her property to appellee. When told subsequently to the making of the will before us that there were rumors that she had made a will in favor of appellant she said the rumors were untrue; that she had made a will after her husband's death in 1938 leaving all her property to appellee; that she had signed a paper that Lyle Doan had an attorney draw up for her but it was not a will. Another witness testified:

"Along toward the last, she said: 'You know what people are saying about me now?' I said, 'No.' She said, 'They are telling a great big lie.' I said, 'How is that?' She said, 'They tell me I made out my will and have left everything to Lyle Doan. That is sure a great big lie. I am under no obligations to Lyle Doan, and I am not leaving anything to him. I have my will made out and I have left it all to my niece, Lulu Miller.' "

As stated, the attorney testified that at the time he drew the will Mrs. Eiker said she and appellee did not get along well; that appellee had left her home and obtained employment and that she wanted to leave the bulk of her property to appellant. However, there is evidence Mrs. Eiker helped appellee secure employment and consented, though with reluctance, to her leaving home. During the winter of 1938 and 1939, she asked her friend, Mrs. Sperry, who was in the fur business in Fort Dodge, to employ appellee, who had worked for a furrier in Minneapolis. Mrs. Sperry testified:

"She said: 'I have a niece, Lulu Miller, who is here to stay with me this winter, and I feel I don't need someone with me all the time.' She said if she could have a job at our place and work there in the daytime and stay with her nights, she would be very glad if I could get her a job. * * * Subsequently, Mrs. Eiker asked me at various times during that winter and fall

if we could use Mrs. Miller, and finally Mrs. Miller came down and Mr. Sperry engaged her for the following fall.''

Another witness stated:

''After Mrs. Miller left, she said that Mrs. Miller had a chance to go back into her line of work and that she thought Mrs. Miller should do so. She didn't want Mrs. Miller to leave, but at that time she felt that Mrs. Miller had this chance to go back to her previous work and she felt she should do it. She didn't like to be alone and she was sorry that Mrs. Miller had to do that.''

Another witness testified:

''* * * she thought Lulu should do what was best for herself. She said Lulu was her only relative and that she intended everything she had should be left to Lulu.''

Appellee's daughter testified:

''She often made the remark that she' never could afford to pay mother very much, could only afford to pay her five dollars a month * * * and that was hardly enough to keep anyone. * * * she always said she had often called Sperry's herself and would call different places asking if mother could obtain work there. * * * she said that if Lulu could better herself, that was the thing she had to do because she was a young, woman and had to look out for herself, the same as Mrs. Eiker had to look out for herself when she was young. This specific conversation was after mother left, probably a week. Within the next six weeks, she discussed it again, at Thanksgiving. I was at grandmother's house. Mrs. Eiker said she was very glad my mother had a good position.''

From this and other like testimony, the jury could find that there was no substantial change in the lifelong friendship between testatrix and appellee prior to or subsequent to the execution of the will. This view is supported by a letter written appellee a few weeks prior to her leaving Minneapolis to live with testatrix. Apparently appellee first wrote testatrix that she could not accept her invitation to make her permanent home with

her and in reply to this refusal testatrix wrote to appellee, among other things, the following:

"And now I am writing to you not to consider me in any way. But make your plans to care for yourself in any way that will be best for you. My time here will probably not be so long as yours. You may live many years yet. God only knows about that and now listen—I prefer that you keep your own home and your own good job. I wish you to do what is best for yourself now and always. And I feel pretty sure you will not be as happy and contented here as you are in Minneapolis where you have made your home so many years. Your friends are there. * * * So leave things just as they are now and don't make any changes. I can get along here very well. I am getting my affairs in pretty good shape now."

We conclude reasonable minds might differ as to the conclusion that should be drawn from the evidence and the trial court was right in submitting the question of undue influence to the jury.

II. Appellant's second proposition is that the court erred in overruling his motion to strike from the record opinions expressed by lay witnesses that the testatrix was of unsound mind on the ground that the facts recited by the witnesses did not support the opinions expressed. The opinion of a nonexpert witness that a testator was of unsound mind is not stronger than the facts testified to by the witness on which his opinion is based. Bailey v. Cherokee State Bk., 208 Iowa 1265, 227 N. W. 129; In re Estate of Paczoch, 202 Iowa 849, 211 N. W. 500. Prior to the ruling on this motion, the court had sustained appellant's motion to withdraw the issue of testamentary capacity. Appellant stated in argument that "allowing the expressed opinions of the said several witnesses to remain in the record was prejudicial and enabled the contestant to argue that in determining the issue of undue influence, the jury should be guided by the opinions so expressed as to mental soundness." Appellant cites In re Will of Muhr, 218 Iowa 867, 870, 256 N. W. 305, 307. This case holds, in effect, that testimony bearing on a dismissed issue should not remain in the record when it has no material bearing on any remaining issue.

While the facts recited by the witnesses were not sufficient to warrant the submission of the issue of testamentary capacity to the jury, they had a bearing on the mental strength of testatrix and the question of her susceptibility to undue influence. As stated in the Muhr case:

"* * * a person of weakened and impaired mind *may be* more susceptible to undue influence, depending upon the extent to which the mind is weakened or impaired, if at all, as shown by the evidence."

After properly stating in instruction 7 that the jury could consider the mental strength or weakness of testatrix in deciding the issue of undue influence, the court, in instruction 11, expressly limited the force of opinions of lay witnesses that testatrix was of unsound mind in the following language:

"Although the issue of testamentary capacity has been withdrawn from your consideration, yet there is left in the case the evidence which has been introduced to show the mental strength or weakness of Jennie Eiker. You may consider such evidence as bearing upon the existence or non-existence of undue influence as charged. In this connection, however, you are instructed that the opinion of a non-expert or lay witness that the testatrix was of unsound mind is no stronger than the facts testified to by such witness and upon which he bases his opinion *and you should give his opinion no greater weight or less weight than you would to the facts testified to by him upon which the opinion is based.* * * * You are instructed in regard to this phase of the case merely as an aid to you in your determination of the existence or nonexistence of undue influence as the same is submitted for your determination." (Italics supplied.)

In view of this instruction, we conclude there was no prejudicial error in refusing to strike the conclusions and opinions of the witnesses.

III. Appellant alleges the court erred in giving instruction 11 because (1) the evidence remaining in the case did not tend to prove mental weakness and (2) the court affirmatively directed the jury to consider, on the sole issue of undue influ-

ence, unsoundness of mind, notwithstanding the issue as to such unsoundness was not then in the case.

We are unable to agree with these propositions. We are satisfied that the evidence did tend to prove mental weakness. There was no issue of unsoundness of mind in the case. The issue withdrawn by the court was testamentary capacity. The terms are not synonymous. It is not every unsoundness of mind that prevents testamentary capacity. The court expressly limited the force and scope of the opinions of the witnesses as pointed out in Division II. There is no reversible error in this instruction.

IV. Another error alleged is the court erred in refusing to strike testimony and declarations of testatrix concerning her intentions as to the disposition of her property and as to what she had done with her property, on the ground there was no independent evidence of undue influence. Our holding in Division I of this opinion disposes of this proposition adversely to appellant.

V. Appellant alleges the court erred "in entering judgment declaring the will to be wholly invalid and void and adjudging that the probate thereof shall be and 'the same is hereby denied and refused.' "

He quotes from 1 Page on Wills, Lifetime Edition, section 193, as follows:

"Where it can be shown that a part of the will was caused by undue influence, and that the rest of the will was not caused thereby, and the part of such will caused by undue influence can be separated from the rest, leaving it intelligible and complete in itself, it is held, in most states, that only such part of the will as is caused by undue influence is invalid, and the rest is valid. * * *

"If undue influence has been exerted as to the residuary clause only, the residuary clause is invalid; the other gifts are valid; and the residue will be distributed as in intestacy."

Appellant states the ruling is erroneous because the undue influence charged was the alleged undue influence only of Lyle Doan. Obviously, the ruling was not erroneous for the reason assigned by appellant. Furthermore, the objections to probate

of the will alleged it was procured by undue influence and appellant interposed a specific denial. The case was tried and the jury instructed on the theory that the entire will was valid or invalid. Appellant's requested instructions recognized this theory. Appellant's main contention is that he did not exercise undue influence on the testatrix. He does not undertake to show which part of the will was caused by undue influence and which part of the will was valid. We find no merit in this assignment.—Affirmed.

SAGER, GARFIELD, BLISS, and HALE, JJ., concur.

WENNERSTRUM, C. J., and MILLER, J., dissent.