IN RE ESTATE OF JOHN TELSROW.

MATILDA TELSROW et al., Appellees, v. ALVENA TELSROW et al., Appellants.

No. 46797.

MAY 7, 1946.

REHEARING DENIED JUNE 21, 1946.

F. A. Martin, of Wilton Junction, E. C. Halbach, of Clinton, and France & France, of Tipton, for appellants.

Howard P. Eckerman, of Davenport, Donnelly, Lynch, Anderson & Lynch and C. J. Lynch, all of Cedar Rapids, for appellees.

GARFIELD, J.—Testator, John Telsrow, a bachelor, age seventy-six, died March 16, 1944. He left as heirs two sisters, Matilda Telsrow, age sixty-one, and Emma Korthaus, age seventy-one; three brothers, Louis, age seventy-three, Ed, age sixty-nine, and Gus, age sixty-four; four children and five grandchildren of testator's brother Will, who died in 1925. Testator left a farm of one hundred eighty acres in Cedar county, worth at least $27,000, and bank deposits, government bonds, and postal savings of something over $51,000.

John's will, made June 30, 1942, devises the farm to Alvena and Rosie Telsrow, wives respectively of the brothers Ed and Gus, and bequeaths the bank deposits, bonds, and postal savings in three equal shares to Eleanore and Howard Telsrow, daughter and son of Ed and Alvena, and Harold Telsrow, son of Gus and Rosie. The will nominates Eleanore, then twenty-six years old, executrix without bond.

Proponents of the will are the sisters-in-law, Alvena and Rosie, who are also sisters, and the nephew, Harold. Eleanore and Howard did not appear as proponents but were witnesses for contestants upon the trial. Contestants are testator's two sisters, three brothers (including Ed and Gus), and two sons of the deceased brother.

█ I. Proponents contend the evidence is insufficient to support the jury's finding of undue influence and that their motions for directed verdict and judgment notwithstanding verdict should have been sustained. We will consider the evidence in the light most favorable to contestants, giving them, as we must, the benefit of all inferences reasonably permissible.

Testator farmed until 1912, when he moved to Durant to live with his father, mother, and sister Matilda. The mother died in 1913; the father, in 1918. John continued to live in the home with Matilda until his death. From 1925 on the brother Louis also lived there. Matilda purchased the home soon after her father died. She paid the household expenses, kept up the home, prepared the meals, kept house, and cared for John when he was sick, without pay.

. About 1938 testator's health began to fail. Before then he assisted Matilda in caring for her garden, mowing her lawn, and the like. After 1938 or 1939 he was unable to do those things. Prior to 1940 testator made frequent trips to his farm and during busy times helped his brother Ed with farm work. In 1940 testator became confused and attempted to drive his car into a neighbor's garage. He never drove his car again. In December 1941, testator suffered a light stroke from which he never recovered. After this he was unable to walk any distance without help; he failed more rapidly, both physically and mentally; he lost control of his kidneys and bowels; this condition grew worse. From this time on it was necessary for

Matilda to care for John much as if he were a baby—clean his clothing and bed and help bathe him. When he had involuntary bowel movements he did not appear to know it and was not embarrassed.

After December 1941, John was unable to recognize relatives—his sister Emma, his brothers Ed and Gus, and other relatives and acquaintances. He expressed surprise that his father, mother, and brother Will did not come to see him. As stated, Will had been dead since 1925 and his parents even longer. When Matilda explained that Will had been dead for years, John did not seem to understand. From December 1941 on testator would not talk and made no response to questions except sometimes to mumble. He had a silly grin on his face.

Without going into detail, there is much convincing evidence that when the will was made on June 30, 1942, testator was incapacitated mentally and, to a considerable extent, physically. Nine lay witnesses—at least four of them appear to be wholly disinterested—give their opinion testator was then of unsound mind, after relating facts which tend to support such conclusion.

A doctor, apparently disinterested, who examined testator on April 30 and May 15, 1942, gives persuasive testimony that testator then had no understanding "where he was at," was unable to understand when spoken to, "questions did not seem to register with him," he was unable to express himself intelligently, his mind was not functioning; he was in an advanced stage of arteriosclerosis and senile dementia; his condition would get progressively worse; he did not have the mental ability to recollect his property, his relatives, or their claims upon his bounty; was mentally unable to exercise judgment, reason, or discretion; would have no understanding of any will he might sign; his unsoundness was so apparent that anyone who talked with him would know it.

Two experts—Dr. Love of Iowa City, and Dr. Stewart, superintendent of the State Hospital for the Insane at Independence—say, in answer to a hypothetical question nine pages long, that testator was of unsound mind when the will was made; had an extreme case of senile dementia; was unable to exercise judgment, reason, or discretion, or to know his obliga-

tions to his relatives or the extent of his property, or to understand any will prepared for his signature. Dr. Stewart testifies that persons in the mental·condition of testator are readily subject to the influence of others.

As opposed to contestants' showing of mental incapacity, only one lay witness, aside from the three proponents and the attorney who drew the will, expresses the opinion testator was of sound mind when the will was made. Proponents produced no expert testimony.

There is direct evidence that on June 30, 1942, about 9:30 a.m., Alvena and Rosie Telsrow called at Matilda's home for John, saying they wanted to take him for a ride but they did not say where they were going. Alvena was driving the Dodge car that had been John's before he transferred it in February 1942 to Alvena's daughter Eleanore. Matilda put John's coat on him and the sisters-in-law assisted him into the car. "They took hold of him, he could hardly walk. He could not get to the car without help."

From Matilda's home in Durant they drove to a bank in Wilton Junction where Alvena and Rosie had an account and there was a large account in John's name. Alvena deposited $646 in her and Rosie's account and drew a check on it payable to John for $1,022, to pay the balance of a note given by Alvena to John on November 21, 1938, for money loaned her by John. The banker computed the interest on the note. None of the five bank accounts in John's name shows any deposit of this $1,022. The banker gives it as his best recollection that both Alvena and Rosie were with John at the bank.

There is evidence that from Wilton Junction Alvena and Rosie drove John to Muscatine to the ·office of an attorney whom John did not know. Alvena testifies she left John at the lawyer's office, drove her car not more than two blocks, parked it and walked directly back to the office. Just as she opened the office door, she says John was coming out of the office holding in his hands the will in an envelope and a receipt for $10 he had paid the attorney for drafting the will. John gave the will and receipt to Alvena; she put the papers in her purse; she and John walked to the car, John without assistance; she drove to Wilton Junction, stopped at the bank

where Alvena and Rosie had four safe-deposit boxes; she placed the will and receipt in one of the boxes, where they remained until the day after John's funeral. From Wilton Junction they drove to Matilda's home at Durant, where they arrived about 3:30 p.m. Matilda asked the sisters-in-law where they had been but they gave no answer. John was then "all wet and a little mussed."

The witnesses to the will are the lawyer, who says he took notes from what John told him, and his associate, who died before the trial, who is said to have typed the will. The surviving attorney testifies John came into the office and sat down without help although "he seemed to be afflicted"; the attorney did not recall ever having seen John before; John gave him the information pertaining to the will; the attorney made notes from what testator told him; these notes were given the other attorney, who typed the will; testator appeared to read the will, signed it "with some difficulty"; the attorneys signed as witnesses at John's request, John paid them $10 in currency, for which they gave him a receipt; John then left the office unassisted; the whole transaction took about a half hour.

While the attorney testifies only he, his associate, and John were present in the office, shortly after John's death the attorney admitted there might have been some women outside the office in a car and that there was a short woman (apparently Rosie is short) in the front office with John when the will was made.

Before further reference to the evidence, we consider the applicable rules of law.

Undue influence in cases of this kind may be, and usually is, proven by circumstantial evidence. Direct proof is seldom available. Shaw v. Duro (Hale, J.), 234 Iowa 778, 789, 14 N. W. 2d 241, 246 · Monahan v. Roderick (Evans, J.), 183 Iowa 1, 6, 166 N. W. 725; Liddle v. Salter (Ladd, J.), 180 Iowa 840, 843, 163 N. W. 447; James v. Fairall (Deemer, J.), 154 Iowa 253, 262, 134 N. W. 608, 38 L. R. A., N. S., 731; 68 C. J. 780, 781, section 466.

The issue of undue influence in a will contest cannot be separated from that of testamentary capacity. Conduct which might be insufficient to influence unduly a person of normal

mental strength might be sufficient to operate upon a failing mind. One who is infirm and mentally weak is more susceptible to influence than one who is not. In re Estate of Ensminger, 230 Iowa 80, 82, 296 N. W. 814, 815, and cases cited; 68 C. J. 767, section 458.

While opportunity and disposition to exercise undue influence are properly to be considered, proof of such opportunity and disposition is insufficient. Also, importunity, request, and persuasion that do not control the will are not enough. In re Estate of Heller (Bliss, J.), 233 Iowa 1356, 1367, 11 N. W. 2d 586, 592, and cases cited; 68 C. J. 791, 792, section 472.

That a will is unnatural, unjust, or unreasonable is also a proper circumstance to be considered, along with evidence that undue influence was exerted, as tending to confirm the claim of undue influence. In re Estate of Eiker, 233 Iowa 315, 317, 6 N. W. 2d 318, 320, and cases cited; Pirkl v. Ellenberger (Gaynor, J.), 179 Iowa 1122, 1129, 162 N. W. 791; annotation 66 A. L. R. 228, 250.

While this may be a borderline case on the issue of undue influence, we think the evidence sufficient to support the jury's finding of undue influence on the part of Alvena and Rosie Telsrow. There are too many significant circumstances to have warranted a directed verdict for proponents.

Although the jury found in answer to a special interrogatory that testator had sufficient mental capacity, it is proper to conclude (if they did not make an inadvertent mistake in writing their answers to the two interrogatories) they found testator was extremely weak, both physically and mentally, and readily subject to influence.

It is apparent there was ample opportunity for the two sisters-in-law to influence unduly this incapacitated testator. That they had the disposition to do so also sufficiently appears. These women were not without experience in business affairs. At least since 1940 they conducted a farming enterprise of their own. As stated, they had at least four safe-deposit boxes in one bank. They engaged in litigation with their two sisters. Their disposition is shown by the fact they called for testator under the pretext of wanting to give him a ride, presumably for pleasure. They sought to conceal their intention

to take this afflicted man to a strange lawyer to make an unjust and unnatural will. As soon as the will was executed they secured and kept possession of it, concealing the entire transaction from other members of the family, including their own husbands, until after testator died.

We have not only a testator unquestionably subject to undue influence, together with opportunity and disposition to exercise such influence, but also a will that appears to be the result thereof. The will does not mention any of testator's heirs. The injustice of excluding the sister Matilda, in particular, is obvious. Without recompense she had housed, fed, and nursed testator for about twenty-four years and was destined to care for him the remainder of his life. Several witnesses testify to the harmonious relations between John and his sisters and brothers. No adequate explanation is offered, except that of undue influence, why testator should exclude Matilda and his other heirs and give all his property to these two aggressive sisters-in-law and their three children. It is significant that Alvena's daughter and son apparently favor the contestants, notwithstanding the large legacies to them.

The jury could properly find the will could not have been made as testified by Alvena and the attorney. There is persuasive testimony that John was unable to walk unassisted from the car into the lawyer's office or the two blocks from the office to the car. At the start of the trip he was unable to walk unassisted from the house where he lived to the car. Indeed "he had to have aid to get from the bedroom to the kitchen" at about that time. If the doctor who examined him on April 30th and May 15th and many other witnesses are believed, testator was wholly unable not only to walk unassisted but also to give the attorney the information from which the will was prepared or to comprehend the nature of the instrument. If testator was in the condition these witnesses describe, no attorney should have prepared a will for him.

The attorney testifies John did not tell him the middle names of the niece and two nephews named in the will. Yet their middle names are written in the will. The attorney says John told him his personalty consisted of cash, moneys and credits, and nothing else. The will bequeaths "all bonds,

postal savings and cash on deposit in banks.'' Where did the attorney get the middle names of the legatees and the information there were bonds and postal savings? The attorney testifies John paid him $10 in currency. Matilda says he had ónly a dollar bill and a little small change when he left home. The conclusion is warranted Alvena furnished the money to pay for drafting the will as well as the information from which it was prepared.

It is worthy of consideration that the jury could find Alvena, Rosie, and the attorney who testify to proponents' version of the making of the will were not to be believed. Alvena and Rosie denied they called for John at Matilda's home or returned him there the day the will was made. Alvena says John was at her home that day and the trip started and ended there. Alvena and Rosie deny they were together at any time on June 30th. Their testimony is contradicted not only by Matilda but also by a neighbor, who both say Alvena and Rosie both called at Matilda's for John and returned him there later in the day. Also, as stated, the Wilton Junction banker, a witness for proponents, gives it as his best recollection that both Alvena and Rosie were at the bank with John. Further, Alvena's daughter Eleanore and son Howard give testimony for contestants inconsistent with Alvena's version of what happened on the day the will was made.

The conclusion is warranted that Alvena had sufficient influence upon testator as early as 1938, when he began to ''slip,'' to obtain from him a loan of $2,800 upon her unsecured note. It is significant that all endorsements of credits on the note, except the last two, which were made by the banker, were made by Alvena.

We think the combined effect of all the proven circumstances sufficient to make the issue of undue influence for the jury. The stealthy way in which this almost helpless man was taken to a strange lawyer in Muscatine, the circumstances surrounding the making of this unjust and unnatural will, the obtaining and retention of it by Alvena, the refusal to inform Matilda the trip to Muscatine had been made, concealing the transaction from other members of the family, together with

other circumstances shown, constitute substantial evidence of undue influence.

In Shaw v. Duro, 234 Iowa 778, 781, 14 N. W. 2d 241, 242, we say, "* * * whether or not there was such undue influence as would vitiate a will must depend upon the facts in each particular case." However, among the decisions that tend to support our conclusion are, In re Estate of Coe, 234 Iowa 1113, 15 N. W. 2d 278, and comment 30 Iowa L. Rev. 321; In re Estate of Eiker, 233 Iowa 315, 6 N. W. 2d 318; In re Will of Jahn, 195 Iowa 74, 189 N. W. 974; In re Will of Busick, 191 Iowa 524, 182 N. W. 815; Monahan v. Roderick, 183 Iowa 1, 166 N. W. 725; Pirkl v. Ellenberger, 179 Iowa 1122, 162 N. W. 791; James v. Fairall, 154 Iowa 253, 134 N. W. 608, 38 L. R. A., N. S., 731.

II. Proponents complain of the overruling of their objection to the long hypothetical question contestants asked Doctors Love and Stewart. The question was objected to, in substance, as incompetent, irrelevant, immaterial, no proper foundation laid, contains an incomplete recitation of facts and facts not borne out by the record. At best, it is doubtful if the objection to the question is sufficiently specific. There was no objection to any particular statement in the question. It is the duty of counsel to point out the particular defect or defects in such a question so the statements objected to may be corrected or eliminated. Ranne v. Hodges (Ladd, J.), 181 Iowa 162, 177, 178, 162 N. W. 803, and cases cited; Reynolds & Heitsman v. Henry (Faville, J.), 193 Iowa 164, 167, 168, 185 N. W. 67; 4 C. J. S. 587, 588, 589, section 295b(1).

Aside from the above, the rulings were not erroneous in the respects complained of here. While the facts stated in a hypothetical question must have support in the evidence (Anderson v. Sheuerman, 232 Iowa 705, 708, 6 N. W. 2d 125, 126, 127, and cases cited), the question need not contain all the facts shown by the evidence. Diesing v. Spencer, 221 Iowa 1143, 1149, 266 N. W. 567; Neal v. Sheffield Brick & Tile Co., 151 Iowa 690, 693, 130 N. W. 398; Munier v. Michel, 147 Iowa 312, 314, 126 N. W. 149; 20 Am. Jur. 662, section 788. Some facts which proponents complain were omitted from the question were brought out by their witnesses after the hypo-

thetical questions were asked. It was not necessary, if indeed it were possible, to include in the question facts subsequently developed. Kirby v. Chicago, R. I. & P. Ry. Co., 173 Iowa 144, 159, 155 N. W. 343; 32 C. J. S. 352, 354, section 551b(2). We think the facts assumed in the hypothetical question have support in the evidence. At least some latitude must be allowed in the choice of facts stated in such a question and the trial court has considerable discretion in ruling on an objection thereto. Contestants were entitled to frame the question according to their theory of the case, as their construction of the evidence showed the facts to be or as the jury would have a right to find them. Diesing v. Spencer, 221 Iowa 1143, 1148, 266 N. W. 567, and cases cited; 32 C. J. S. 353–355, section 551b(2); 20 Am. Jur. 668, 669, section 796.

In any event, the ruling complained of was without prejudice since the jury was fully instructed that if the facts stated in the hypothetical question were incorrect, unfair, or untrue, or did not fairly include all facts in evidence upon the subject of the inquiry, then the opinions based thereon should be disregarded. Howe v. Richards, 112 Iowa 220, 225, 226, 83 N. W. 909; Reynolds & Heitsman v. Henry, 193 Iowa 164, 168, 185 N. W. 67.

III. Instruction 12 told the jury, in substance, the provisions of the will, whether just or unjust, reasonable or unreasonable, natural or unnatural, should be considered in determining both mental capacity and undue influence, but if they found the will unjust, unreasonable, or unnatural, that alone would not invalidate it but might be considered with other evidence in determining the ultimate issues. Proponents excepted to the instruction because it should "embrace in substance the right of an individual to make a will that may be unjust and unfair" and gives the claim that the will was unjust, unreasonable, or unnatural undue weight. When the instructions as a whole, especially No. 13, are considered, the exception to No. 12 is without merit.

Instruction 13 informed the jury, in substance, that testator, if in his right mind, had the right to do as he pleased with his property and was under no legal obligation to provide

for any of the contestants; that whether or not the will was reasonable should be considered only in connection with other evidence, to determine the issues of mental capacity and undue influence and if testator was not of unsound mind and not unduly influenced, the failure of the will to provide for others would not invalidate it.

Instruction 13 sufficiently meets the first part of proponents' exception to instruction 12 and also adequately covers the substance of proponents' first requested instruction.

Perhaps the principal complaint now made of instruction 12 is bottomed on language in some of our decisions to the effect that inequality of a will is without probative force in the absence of any evidence that tends to show undue influence. See Johnson v. Johnson, 134 Iowa 33, 35, 111 N. W. 430, and cases cited; In re Estate of Rogers, 229 Iowa 781, 788, 295 N. W. 103, 106; In re Estate of Eiker, 233 Iowa 315, 317, 6 N. W. 2d 318, 320. It is doubtful if the exception to instruction 12 raises the complaint proponents now make.

In any event, instructions 12 and 13 both plainly state in effect that if the will is unjust it would not for that reason be invalid but such fact should be considered only in connection with other evidence. Neither instruction 12 nor 13 is inconsistent with the authorities cited last above, nor is No. 12 vulnerable to proponents' complaint. Manatt v. Scott, 106 Iowa 203, 216, 76 N. W. 717, 68 Am. St. Rep. 293, and cases cited; Ranne v. Hodges, 181 Iowa 162, 165, 162 N. W. 803, and cases cited; 68 C. J. 1117–1119, section 935.

IV. By way of impeachment, contestants asked two of their witnesses regarding a conversation between them and the attorney who testified about making the will. Inquiry was made of each whether at a named time and place the attorney was asked if there were some women with John when he made the will, to which the attorney replied, "no, well, there might have been out in the car," or that in substance. Inquiry was also made of each witness whether the attorney was asked in the same conversation if there was a short woman with John, to which the attorney said in substance she was in the front office. Proponents' objection to each inquiry was overruled

and each witness answered "yes" to each question. Proponents contend the evidence was not material and that no proper foundation for the impeaching evidence was laid by the testimony of the attorney. The rulings were proper.

Whether Alvena and Rosie were with testator when the will was made was certainly material. At the start of the trial the attorney testified on direct examination as a witness for proponents, "No one else was present." Proponents apparently then thought it material whether anyone accompanied testator to the law office. In cross-examining the attorney, contestants asked him about his later conversation with their two witnesses. The attorney denied saying there was a short woman in the office but said he "might have said in substance," and "probably" did, that there might have been some women out in the car. Clearly, there was sufficient foundation for the second impeaching question asked contestants' witnesses. We think the attorney's equivocal and indirect answer to which we have just referred was sufficient foundation for the first impeaching question. 70 C. J. 1118, 1119, section 1298; 28 R. C. L. 639, section 224. See, also, Sheldon v. Bigelow, 118 Iowa 586, 588, 92 N. W. 701. In any event, there was little if any prejudice to proponents from the overruling of their objection to the first question.

V. In the order denying probate of the will a general administrator of the estate was appointed. Proponents contend, by reason of their appeal, this was premature. Since we hold no other assignment of error is well taken and there should be an affirmance, proponents now have no standing to urge this contention. They are not heirs and have no interest in the estate. In re Estate of Whitehouse, 223 Iowa 91, 272 N. W. 110, cited by proponents, is not in point. There the order of the lower court was stayed by this court, the case was reversed, and a new trial granted proponents.

VI. Contestants appealed from the overruling of their motion to set aside the jury's finding of mental capacity but ask that such appeal be considered only if the judgment in their favor should be reversed. Since we affirm the case on pro-

ponents' appeal, there is no occasion to consider contestants' cross-appeal.—Affirmed.

BLISS, C. J., and OLIVER, HALE, MILLER, SMITH, MANTZ, and MULRONEY, JJ., concur.

WENNERSTRUM, J., not sitting.